# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 15, 2021

Lyle W. Cayce
Clerk

No. 20-10876

Vicki Timpa, *individually, and as representative of* The Estate of Anthony Timpa; K.T., *a minor child*; Cheryll Timpa, *as next of friend of* K.T., *a minor child*,

*Plaintiffs—Appellants*,

*versus*

Dustin Dillard; Danny Vasquez; Raymond Dominguez; Domingo Rivera; Kevin Mansell,

*Defendants—Appellees*,

*versus*

Joe Timpa,

*Intervenor—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC 3:16-CV-3089

Before Clement, Southwick, and Willett, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

This appeal arises from the death of Anthony Timpa while he was being restrained by law enforcement after he called 911 and asked for

assistance during a mental health episode.  Timpa's family (the Plaintiffs) filed this 42 U.S.C. § 1983 lawsuit, alleging that five officers (the Officers) of the Dallas Police Department (DPD) violated Timpa's Fourth Amendment rights by causing his death through the prolonged use of a prone restraint with bodyweight force during his arrest.  As relevant to this appeal, Plaintiffs asserted claims of excessive force and of bystander liability.  The district court granted summary judgment to the individual Defendant-Officers on all claims and held that they were entitled to qualified immunity.  We REVERSE summary judgment as to the claim of excessive force, and we AFFIRM in part and REVERSE in part as to the claims of bystander liability.

## I.

On the evening of August 10, 2016, Timpa called 911 and asked to be picked up.  He stated that he had a history of mental illness, he had not taken his medications, he was "having a lot of anxiety," and he was afraid of a man that was with him.  The call ended abruptly.  When the operator called back, Timpa provided his location on Mockingbird Lane in Dallas, Texas.  In the background of the call, the sounds of honking and of people arguing could be heard.  A motorist then placed a 911 call to report a man "running up and down the highway on Mockingbird [Lane,] . . . stopping traffic" and attempting to climb a public bus.  A private security guard called 911 with the same report and noted his belief that the man "[was] on something."  The dispatcher requested officers respond to a Crisis Intervention Training (CIT) situation and described Timpa as a white male with schizophrenia off his medications.

A CIT call informs responding officers that the situation involves an individual who may be experiencing mental health issues.  DPD General Orders instructed that five officers report to CIT calls to perform the "Five-

No. 20-10876

Man Takedown," which is a control technique where each of four officers secures one of the subject's limbs while a fifth officer holds the head. This technique allows officers to gain control over a subject and simultaneously prevent him from injuring himself or others. Regardless of whether officers were responding to a CIT call, DPD General Orders instructed that, for all arrestees, "as soon as [they] are brought under control, they are placed in an upright position (if possible) or on their side."

DPD General Orders reiterated this instruction for the restraint of subjects suffering from "excited delirium." Excited delirium is "a state of agitation, excitability, and paranoia . . . often associated with drug use, most commonly cocaine." *Goode v. Baggett*, 811 F. App'x 227, 233 n.6 (5th Cir. 2020) (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 444 (5th Cir. 1998)). The Orders described the following symptoms as indicators of excited delirium: "[d]elusions of persecution," "[p]aranoia," and "[t]hrashing after restraint." Officers were instructed to "treat the arrest of a subject [in a state of excited delirium] as a medical emergency" and to "continuously monitor[]" the arrestee because "[s]ubjects suffering from this disorder may collapse and die without warning." The Orders commanded that subjects in a state of excited delirium "will be placed in an upright position (if possible) or on their side as soon as they are brought under control." In addition, the Officers on the scene received specific training on excited delirium, which twice reiterated that officers must, "as soon as possible, move [the] subject to a recovery position (on [their] side or seated upright)" because the prolonged use of a prone restraint may result in "positional asphyxia." The training also warned that "[i]f [the] subject suddenly calms, goes unconscious, or otherwise becomes unresponsive, advise [a paramedic] immediately," because "[a] sudden cessation of struggle is a prime indicator that the subject may be experiencing fatal autonomic dysfunction (sudden death)."

3

Supervising Police Sergeant Kevin Mansell arrived first on Mockingbird Lane at 10:36 p.m. By that point, Timpa had already been handcuffed by two private security guards and he was sitting barefoot on the grass beside the sidewalk. Mansell called for backup and for an ambulance, stating that Timpa was "in traffic . . . and he's definitely going to be a danger to himself." According to Mansell, Timpa was "thrashing" on the ground, "kicking in the air [at] nobody that's there," and "hollering, 'Help me, help me, God help me.'" Once, before the other Officers arrived, Timpa managed to roll into the gutter of the street and Mansell and a security guard lifted Timpa and placed him back on the grass.

Within seven to ten minutes, two paramedics, Senior Corporal Raymond Dominguez, and Officers Dustin Dillard, Danny Vasquez, and Domingo Rivera arrived. Each of the Officers was informed that Timpa was a mentally ill individual off his medications. Three of the Officers (Dillard, Vasquez, and Rivera) were wearing body cameras, which captured the following fifteen minutes.

The footage begins with Timpa handcuffed and barefoot on his back on the grass boulevard beside a bus bench, yelling: "Help me! . . . You're gonna kill me!" The Officers attempted to calm Timpa. Timpa rolled back and forth on the grass, then rolled close to the curb of the street. Dillard and Vasquez immediately forced Timpa onto his stomach and each pressed one knee on Timpa's back while a security guard restrained his legs.

Vasquez removed his knee after approximately two minutes. Dillard continued to press his knee onto Timpa's upper back in the prone restraint position for fourteen minutes and seven seconds. He pressed his left knee into Timpa's back and his left hand between Timpa's shoulders with his right hand pressing on Timpa's right shoulder intermittently. In his protective vest and duty belt, Dillard weighed approximately 190 pounds.

No. 20-10876

Approximately fifteen seconds into the restraint, Dillard asked Timpa: "What did you take?" Timpa answered, "Coke."[1] One minute into the restraint, a paramedic attempted to take Timpa's vitals. The paramedic was unable to get a reading as Timpa continued to struggle and yelled: "I can't live!" Between three to seven minutes into the restraint, the Officers swapped out the private security guard's handcuffs with some difficulty because of Timpa's continued flailing.[2] At the same time, the Officers zip tied Timpa's ankles and forced his lower legs under the cover of a concrete bus bench. While the Officers were securing restraints on Timpa's ankles, one Defendant-Officer said: "We don't have to hogtie him, do we?" Another Defendant-Officer suggested "we could pull his legs up." The Officers ultimately left Timpa's legs under the bus bench.

Seven minutes into the restraint, Timpa—prone and cuffed at the hands and ankles—had calmed down sufficiently for a paramedic to successfully take his vitals. When the paramedic approached, Dillard asked: "Do you want me to roll him over?" The paramedic responded: "Before y'all move him, if I can just get right here and see if I can get to his arm."

---

[1] Dillard testified that he did not hear Timpa reply, "coke," but the video confirms that Timpa audibly stated he had taken cocaine. The footage reflects Dillard asking Timpa what he had taken at least seven times during the restraint and concluding at least three times that Timpa "took something." Timpa was also exhibiting signs of excited delirium, such as "yelling incoherently[] and acting really strange." *Goode*, 811 F. App'x at 236 (internal quotation marks omitted); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 414 (5th Cir. 2021) (noting that a subject's "plainly erratic behavior" gave officers "reason to know of the substantial risk that [the subject] . . . was in a state of excited delirium"). Drawing all inferences in favor of the Plaintiffs, Dillard was aware that Timpa may have been in a state of excited delirium approximately twenty seconds into the restraint.

[2] The parties dispute whether Timpa kicked at the Officers during the arrest. Dillard testified that he did not observe Timpa intentionally kick at any Officers. The video does not clarify whether Timpa was flailing or aiming to kick. The dispute is not material because kicking in the air is still a form of resistance to arrest. *See Tucker v. City of Shreveport*, 998 F.3d 165, 182 (5th Cir. 2021).

While the paramedic was taking Timpa's vitals, Rivera left the scene to find Timpa's car. By the time the paramedic had finished, approximately nine minutes into the restraint, Timpa's legs had stopped kicking, though he remained vocal and kept calling for help.

Thirty seconds later, only Timpa's head moved intermittently from side to side. He continued to cry out "Help me!" but his voice weakened and slurred. Much of what he said was too muffled to be comprehensible. Forty-five seconds later, he suddenly stilled and was quiet except for a few moans. Then, he fell limp and nonresponsive for the final three-and-a-half minutes of the restraint.

The Officers discussed what to do next. Dominguez said to Mansell: "So what's the plan? You're [in charge] out here, sir." Mansell responded that they should "strap [Timpa] to a gurney." Mansell then returned to his patrol car, "a few feet [away]," to check for warrants for Timpa's arrest. He sat in his vehicle "with the car door open."

During this time, the Officers began to express concern that Timpa was nonresponsive. Dominguez said, "Tony, are you still with us?" Vasquez said, "Is he acknowledging you anymore?" Dominguez said, "Not really." Dillard called Timpa's name to no response. Dominguez stated that he wanted to "mak[e] sure he was still breathing 'cause his nose is buried in the [ground]." Dillard said, "I think he's asleep!" and stated that he heard Timpa "snoring." Dominguez and Vasquez expressed surprise and then made jesting comments about Timpa's loss of consciousness. A paramedic approached and asked what happened. Dillard responded: "I don't know. He just got quiet." Vasquez said: "All of a sudden, just . . . bloop." The paramedic administered a sedative and Timpa's head twitched. Then, three-and-a-half minutes after Timpa had become nonresponsive, Dillard removed

No. 20-10876

his knee.   Shortly after the Officers placed Timpa on the gurney, the paramedics determined that he was dead.

The Dallas County Medical Examiner conducted Timpa's autopsy and ruled his death a homicide.  The report identified cocaine in Timpa's blood and concluded that he had been suffering from "excited delirium syndrome."  The report further concluded that Timpa died from "sudden cardiac death due to the toxic effects of cocaine and [the] physiologic stress associated with physical restraint," which could have resulted in "mechanical or positional asphyxia."  Plaintiffs' medical expert, Dr. Kim Collins, MD, a forensic pathologist, went one step further and concluded, "to a reasonable degree of medical certainty," that Timpa's death was caused by mechanical asphyxia, which occurs when an individual's torso is compressed, preventing respiration and circulation of oxygen.  She testified that Timpa's obesity, extreme exertion, and state of excited delirium exacerbated the risk of mechanical asphyxiation.  She further testified that Timpa would have lived had he been restrained for the same amount of time in a prone position without force applied to his back.

Vicki Timpa, the mother of the deceased, individually and as representative of the estate of the deceased, and Cheryll Timpa, individually and as next friend of K.T., a minor child of the deceased, filed this Section 1983 lawsuit alleging, as relevant here, a claim of excessive force against Defendant-Officer Dillard and claims of bystander liability against Defendant-Officers Mansell, Vasquez, Dominguez, and Rivera. Joe Timpa, the father of the deceased, later intervened.  On summary judgment, the district court granted qualified immunity to the Officers in their individual capacity on the basis that "there was no law clearly establishing Defendants' conduct as a constitutional violation prior to August 10, 2016."  The district court dismissed the bystander liability claims on the same basis.  On appeal,

No. 20-10876

the Plaintiffs argue that the district court erred in dismissing the excessive force claim and the bystander liability claims.

## II.

We review the district court's grant of summary judgment *de novo*. *See Aguirre*, 995 F.3d at 405. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The defense of qualified immunity "balance[s] two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Where a plaintiff alleges excessive force during an arrest, "the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

Whether the amount of force used was objectively reasonable requires "a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (cleaned up) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). A fact-specific range of permissible force emerges, "such that the need for force determines how much force is constitutionally permissible." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). At one end of the spectrum, "a threat of serious physical harm, either to the officer or to others" may justify the use of deadly force. *Tennessee v.*

*Garner*, 471 U.S. 1, 11 (1985). At the other end of the spectrum, when a subject has been subdued—meaning, he "lacks any means of evading custody" and does not pose a threat of immediate harm—the further use of force is not justified. *Bartlett*, 981 F.3d at 335. For the cases in between, a court should consider the "totality of the circumstances." *Darden*, 880 F.3d at 728.

But a plaintiff's showing that a constitutional violation has occurred is not enough. The doctrine of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to defeat a motion for summary judgment based on qualified immunity, the plaintiff must present evidence "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

## III.

We begin with the excessive force claim against Dillard. The Plaintiffs contend that Dillard unlawfully restrained Timpa in the prone position with bodyweight force pressed on Timpa's back and that the state of the law in August 2016 clearly established that officers could not subject a subdued individual to the use of force. Although we may begin with either prong of qualified immunity, we turn first to the merits of the excessive force claim to provide clarity and guidance to law enforcement.

The Plaintiffs contend that Dillard's restraint of Timpa constituted both excessive force and deadly force in violation of the Fourth Amendment. Claims that law enforcement used deadly force are "treated as a special

No. 20-10876

subset of excessive force claims." *Aguirre*, 995 F.3d at 412 (citing *Gutierrez*, 139 F.3d at 446). We consider first whether Dillard's use of force was excessive and second whether a jury could find the force used was deadly.

### A.

### 1.

The reasonableness of the use of force turns on our consideration of the full factual context, particularly the following three factors: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "A court . . . cannot apply this standard mechanically," but must look through the eyes of a reasonable officer on the scene. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

As to the first *Graham* factor, Dillard's continued use of force was not justified by a criminal investigatory function. The Officers concede that Timpa's criminal liability was "minor"—no more than a traffic violation. *See* Tex. Penal Code § 42.03; Tex. Transp. Code §§ 552.001–.006, 542.301. The Officers did not intend to charge him with any crimes. The first factor weighs against the reasonableness of the prolonged use of bodyweight force. *Cf. Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (noting that "a minor offense militat[es] against the use of force"); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (same).

In addition, we note that these facts do not present the paradigmatic circumstance of "an officer arriv[ing] at the scene with little or no information and [having] to make a split-second decision" in response to criminal activity. *Darden*, 880 F.3d at 732. The Officers had been dispatched to a CIT situation after Timpa himself had called 911 requesting to be picked up. Darden was thus equipped with the understanding that Timpa was likely

experiencing a mental health crisis and needed medical assistance. He arrived to observe a barefoot, handcuffed man in distress on the grass boulevard beside the sidewalk. These perceptions were material to his assessment of "how much additional force, if any, was necessary" to control the situation. *Id.*

The second *Graham* factor considers whether the subject posed "an immediate threat" to the safety of others. *Graham*, 490 U.S. at 396. The Officers contend that the continued use of force was justified because Timpa had interfered with traffic earlier in the evening and had kicked his legs when the Officers attempted to restrain him. But "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009). Approximately nine minutes into the restraint, Timpa was cuffed at both the wrists and the ankles, his lower legs had stopped moving, and he was surrounded by five officers, two paramedics, and two private security guards—most of whom were mulling about while Dillard maintained his bodyweight force on Timpa's upper back.

As to any threat of harm to the Officers, it is obvious that Timpa could no longer kick when he was lying face down and handcuffed with his ankles restrained and confined under the bus bench. As to any threat to himself, Timpa had already calmed down sufficiently for the paramedics to take his vitals. As to any threat to passing motorists, Plaintiffs' expert opined that "it was unlikely, if not completely impossible, for [Timpa] to roll into the street considering he was literally flanked on all sides by police officers." And when the paramedic asked if Timpa could walk to the ambulance in ankle cuffs, Dillard said: "I highly doubt it." A jury could find that no objectively reasonable officer would believe that Timpa—restrained, surrounded, and subdued—continued to pose an immediate threat of harm justifying the prolonged use of force. *Cf. Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241

(2021) (per curiam) (noting that whether a subject "was handcuffed and leg shackled" reflects on "the security problem at issue[] and the threat—to both [the arrestee] and others—reasonably perceived by the officers"); *Aguirre*, 995 F.3d at 409 (holding a genuine dispute of material fact existed with respect to whether a handcuffed subject surrounded by five police officers posed an immediate threat justifying the use of a maximal prone restraint).    The second *Graham* factor weighs against the objective reasonableness of the prolonged use of force.

Turning to the third *Graham* factor, the Plaintiffs have raised a genuine dispute of material fact as to whether Timpa continued to actively resist arrest.  The Officers first argue that the continued use of force was justified because Timpa struggled intermittently.  But "even if [Timpa] failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely." *Bartlett*, 981 F.3d at 335.    Officers cannot use force independent of a subject's "contemporaneous, active resistance."  *Id.*  Thus, even assuming that Timpa's flailing amounted to active resistance, "the force calculus change[d] substantially once that resistance end[ed]" nine minutes into the restraint. *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015); *see also Tucker*, 998 F.3d at 181–82 ("[A] use of force that may begin as reasonably necessary in order to obtain compliance may cease to be so as a suspect becomes more compliant.").

The Officers next argue that Timpa continued to actively resist arrest by "squirm[ing]" and "mov[ing] his head from left to right" in the final minutes of the restraint.  Plaintiffs contend that Timpa moved his body in order to breathe.  Plaintiffs' expert, Dr. Collins, testified that pressing down on the torso of a subject held in a prone restraint "greatly increases the work of breathing," which leads the subject to "experience[] air hunger, panic, and anxiety as Mr. Timpa did."  She concluded: "[i]t can be anticipated that the

victim will attempt to move his body in order to breathe."[3]  The body camera footage does not plainly contradict the Plaintiffs' version of the facts: Timpa attempts to raise his torso and cries out repetitively: "Help me," "You're gonna kill me," "I'm gonna die," "I can't live."

The risks of asphyxiation in this circumstance should have been familiar to Dillard because he had received training on the use of a prone restraint to control subjects in a state of excited delirium.  *See Darden*, 880 F.3d at 732 n.8 ("[T]he violation of police department policies . . . and corresponding notice to officers [is] relevant in analyzing the reasonableness of a particular use of force under the totality of the circumstances.").  DPD training instructed that a subject in a state of excited delirium must, "as soon as possible[,] [be] mov[ed] . . . to a recovery position (on [their] side or seated upright)," because the prolonged use of a prone restraint may result in a "combination of increased oxygen demand with a failure to maintain an open airway and/or inhibition of the chest wall and diaphragm [that] has been cited in positional asphyxia deaths."  Dillard was also trained that "[i]f [the] subject suddenly calms, goes unconscious, or otherwise becomes unresponsive, . . . [a] sudden cessation of struggle is a prime indicator that the subject may be experiencing fatal autonomic dysfunction (sudden death)."  A sudden cessation of struggle and lack of responsiveness is precisely what occurred in the final minutes of Timpa's restraint.[4]  A jury

---

[3] A jury could also consider prominent guidance circulated by the Department of Justice warning of the risk of positional asphyxia resulting from the use of a prone restraint. *See* NAT'L LAW ENF'T TECH. CTR., U.S. DEP'T OF JUST., POSITIONAL ASHYXIA—SUDDEN DEATH (1995), https://www.ncjrs.gov/pdffiles/posasph.pdf; *cf. Lombardo*, 141 S. Ct. at 2241 (noting that "well-known police guidance" warning "that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands," reflects on whether the force used was excessive).

[4] The Officers contend that they believed Timpa to be faking sleep as a tactic to gain an advantage.  That issue "is a factual question that must be decided by a jury."

could find that an objectively reasonable officer with Dillard's training would have concluded that Timpa was struggling to breathe, not resisting arrest.[5] *See Darden*, 880 F.3d at 730 (holding that a "jury could conclude that all reasonable officers on the scene would have believed that [the subject] was merely trying to get into a position where he could breathe and was not resisting arrest"); *see also Goode*, 811 F. App'x at 232 (same). The final *Graham* factor weighs against the objective reasonableness of the continued use of force.

Viewing the facts in the light most positive to the Plaintiffs, none of the *Graham* factors justified the prolonged use of force. A jury could find that Timpa was subdued by nine minutes into the restraint and that the continued use of force was objectively unreasonable in violation of Timpa's Fourth Amendment rights. Of course, a jury may ultimately conclude the opposite: that Timpa was not subdued and that he continued to pose an immediate threat throughout his restraint. Under that consideration of the facts, Dillard's decision to continue exercising force might be reasonable. Ultimately, it is the job of the factfinder, not of this court, to resolve those

---

*Darden*, 880 F.3d at 730. At the summary judgment phase, it is not for us to "weigh the evidence and determine the truth of the matter," but rather, to draw all justifiable inferences in favor of the non-movant. *Liberty Lobby*, 477 U.S. at 249.

[5] That paramedics were present during the arrest and did not intervene does not change the calculus of objective unreasonableness. *See, e.g.*, *Aguirre*, 995 F.3d at 404, 420 (finding a Fourth Amendment violation when officers used a maximal prone restraint despite the presence of a medical tech officer); *Goode*, 811 F. App'x at 229 (finding a Fourth Amendment violation when officers used a hog-tie restraint despite the presence of medical personnel); *Gutierrez*, 139 F.3d at 442–43 (finding a Fourth Amendment violation when officers used a hog-tie restraint despite the assistance of paramedics in placing the subject in that position). And under DPD General Orders, it is not the paramedics but the "[o]fficers [that] are responsible for rendering first aid to injured subjects," including: "[m]onitoring the subject," "[c]hecking pulse and skin color," and "[c]hecking for consciousness."

factual disputes for itself. A jury's interpretation ensures that legal judgments of reasonableness hew closely to widely shared expectations of the use of force by our police officers.

**2.**

The deadly force inquiry is two-pronged: First, whether the force used constituted deadly force; and second, whether the subject posed a threat of serious harm justifying the use of deadly force. *See Gutierrez*, 139 F.3d at 446 (citing *Garner*, 471 U.S. at 11). Plaintiffs argue that the prolonged use of a prone restraint with bodyweight force on the back of an individual who possessed apparent risk factors and posed no serious threat of harm constituted an objectively unreasonable application of deadly force.

**a.**

"[W]hether a particular use of force is 'deadly force' is a question of fact, not one of law." *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). The question is whether a jury could find that the use of force "carr[ied] with it a substantial risk of causing death or serious bodily harm." *Gutierrez*, 139 F.3d at 446 (quoting *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)). The Plaintiffs argue that kneeling on the back of an individual with three risk factors—obesity, excited delirium, and prior vigorous exertion—carried a substantial risk of causing death or serious bodily harm. The Officers argue that the Plaintiffs have failed to set forth sufficient evidence to create a triable fact issue.

The summary judgment record includes DPD's General Orders instructing officers to place subdued subjects—particularly those in a state of excited delirium—in an upright position or on their side. The Officers were trained that the prolonged use of a prone restraint on subjects in a state of excited delirium can result in positional asphyxia death. The jury could also consider prominent guidance from the Department of Justice instructing

that, to avoid positional asphyxia, officers should, "[a]s soon as the suspect is handcuffed, get him off his stomach." DOJ, *Positional Asphyxia—Sudden Death* 1–2.  The Department's guidance highlighted (1) obesity, (2) excited delirium, and (3) vigorous exertion as "predisposing factors" that "compound the risk of sudden death." *Id.*

Plaintiffs also presented expert testimony on the substantial risks of a prone restraint with weight force on an obese and physically exhausted subject in a state of excited delirium.  Plaintiffs' medical expert, Dr. Collins, testified that the prone restraint position with bodyweight force is inherently lethal if used for an extended period of time.  She described in detail how the use of the prone restraint with bodyweight force significantly increased the likelihood of asphyxiation:

> In the prone position, an individual is unable to effectively move the diaphragm, chest wall, and abdomen to breathe. . . . The body is also unable to adequately circulate blood resulting in engorgement and stagnation of blood flow in the upper body. . . . The face, partially or fully, pressed to the ground further decreases oxygenation. . . . When force is on the back and shoulders, . . . [i]t is extremely difficult to move the chest and abdomen. . . . When the body is prone and great force is on the back, the head, neck, and shoulders become engorged with blood while the lower part of the body is of normal color.  Mr. Timpa had marked cyanosis with a clear line of demarcation across his chest indicative of . . . a tremendous amount of pressure to his back.

She testified that Timpa would have lived had he been restrained for the same amount of time in the prone position without force applied to his back.[6]

---

[6] The Officers argue that the Plaintiffs must identify the precise frequency with which death results from the use of a prone restraint combined with weight force.  They cite no caselaw for that premise and we are not aware of any. *Cf. Aguirre*, 995 F.3d at 413–

Dr. Collins further testified that the risk of acute respiratory failure is greater when (1) "[i]ndividuals . . . have been physically exhausted prior to this restraint," (2) "the individual is obese or has a large belly as this mass encroaches on the abdomen and diaphragm," (3) the individual suffers from untreated psychiatric illness, which may increase oxygen demand, and (4) the individual is drug-affected, which "increases metabolism" and requires "more blood pumping through [the] body" carrying "more oxygen." As Dr. Collins explained—and as Dillard had been trained—the latter two factors can result in a state of excited delirium.

A jury could find that all three of these risk factors were apparent on the night that Timpa died. The video footage reflects Timpa exerting significant effort while the Officers applied restraints. The video footage also clearly reflects Timpa's larger body size. The 911 operator informed the Officers that Timpa was a "diagnosed schizophrenic" off his medications. And Timpa told the Officers that he had used cocaine.

Plaintiffs have raised a genuine issue of material fact as to whether the use of a prone restraint with bodyweight force on an individual with three apparent risk factors—obesity, physical exhaustion, and excited delirium—"create[d] a substantial risk of death or serious bodily injury." *Gutierrez*, 139 F.3d at 446. A jury could find that this use of force constituted "deadly force."

**b.**

Officers can use deadly force only if they have "probable cause to believe that the suspect poses a threat of serious physical harm." *Mason v.*

---

14 (relying on an experts' explanation of the increased risks of serious harm from the use of a maximal prone restraint); *Gutierrez*, 139 F.3d at 446 (relying on evidence that "a number of persons" had died from the use of a hog-tie restraint).

*Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 275 (5th Cir. 2015) (quoting *Garner*, 471 U.S. at 11).  Here, the Officers concede that the use of deadly force was not justified.  But the record supports an inference that Dillard knelt on Timpa's back with enough force to cause asphyxiation.

Viewing the facts in the light most favorable to the Plaintiffs, the record supports that Timpa was subdued nine minutes into the continuing restraint and did not pose a threat of serious harm.  The Officers make no argument that the use of asphyxiating pressure was necessary to maintain control of a subdued subject.  In other words, the record supports the inference that, for at least five minutes, Timpa was subjected to force unnecessary to restrain him.  If a jury were, in addition, to find that the use of a prone restraint with bodyweight force on an obese, exhausted individual in a state of excited delirium carried a substantial risk of causing death or serious bodily harm, then the prolonged restraint constituted an objectively unreasonable application of deadly force.

**B.**

The district court determined that no precedent clearly established that the use of a prone restraint with bodyweight force to bring a subject under police control was objectively unreasonable.  But the district court failed to consider the continued use of such force *after* Timpa had been restrained and lacked the ability to pose a risk of harm or flight.  We hold that the state of the law in August 2016 clearly established that an officer engages in an objectively unreasonable application of force by continuing to kneel on the back of an individual who has been subdued.

Officers are entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15 (2015) (per curiam)).  That does not require a showing that "the very action

in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Rather, there can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997)).

Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable. *See Carroll v. Ellington*, 800 F.3d 154, 177 (2015) ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." (citing *Strain*, 513 F.3d at 501–02)). "[A]lthough the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, the permissible degree of force depends on [the *Graham* factors]." *Cooper v. Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016) (quoting *Strain*, 513 F.3d at 502). And "if enough time elapsed between the [subject's active resistance] and the use of force that a reasonable officer would have realized [the subject] was no longer resisting," the further use of force is unnecessary and objectively unreasonable. *Curran*, 800 F.3d at 661 (quoting *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012)). Our decisions in *Strain*, *Cooper*, and *Darden* clearly established the excessiveness of Dillard's continued use of force on a restrained and subdued arrestee.

In *Bush v. Strain*, we held that it was objectively unreasonable for an officer to force a subject's face into the window of a vehicle when the subject "was not resisting arrest or attempting to flee." 513 F.3d at 502. There, the defendant-officer attempted to arrest Holly Bush for simple battery. *Id.* at 496. Partially handcuffed, Bush pulled her right arm away from the defendant-officer. *Id.* Bush alleged that, after the defendant-officer

successfully handcuffed her, he "placed his hand behind her neck and head and forced her face into the rear window of a nearby vehicle." *Id.* Bush suffered severe injuries to her jaw. *Id.* Because none of the *Graham* factors justified the continued use of force, we agreed that it was objectively unreasonable for the defendant-officer to "forcefully slam [an arrestee's] face into a vehicle while she was restrained and subdued." *Id.* at 502.

Similarly, in *Cooper v. Brown*, we relied on the use of force in *Strain* to hold "that subjecting a compliant and non-threatening arrestee to a lengthy dog attack was objectively unreasonable." 844 F.3d at 525. There, Jacob Cooper was suspected of driving under the influence and fled the scene on foot when stopped by an officer. *Id.* at 521. Another officer pursued Cooper and ordered his K9 unit to bite Cooper on the calf. *Id.* Although Cooper immediately became compliant and subdued, the officer did not order the dog to release its bite until after the handcuffs were secured—one to two minutes after the bite began. *Id.* We explained that it was objectively unreasonable for the defendant-officer to "continue[] applying force even after Cooper . . . was on his stomach" and subdued. *Id.* at 523.

Finally, in *Darden v. City of Fort Worth*, we relied on the use of force in *Strain* and in *Cooper* to reiterate that, "it [is] clearly established that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force." 880 F.3d at 733. There, the defendant-officer punched, kicked, choked, and "forced [Jermaine] Darden—an obese man—onto his stomach, pushed his face into the floor, and pulled Darden's hands behind his back." *Id.* At the time that the defendant-officer used the prone restraint with bodyweight force, Darden was compliant and not resisting arrest. *Id.* In addition, the defendant-officer had reason to believe that he was using asphyxiating force because witnesses at the scene were yelling that Darden could not breathe. *Id.* We found that the defendant-

No. 20-10876

officer's actions "were plainly in conflict with our case law" prohibiting the use of force against a subdued subject. *Id.*

We have reaffirmed again and again that this principle applies with obvious clarity to a variety of tools of force because the "[l]awfulness of force . . . does not depend on the precise instrument used to apply it." *Guedry*, 703 F.3d at 763; *see, e.g.*, *Bartlett*, 981 F.3d at 342 (striking an unrestrained, subdued subject in the prone position); *Ellington*, 800 F.3d at 177 (striking a restrained, subdued subject in the prone position); *Curran*, 800 F.3d at 661 (pressing a restrained, subdued subject against a wall); *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (tasing a restrained, subdued subject in the prone position); *Guedry*, 703 F.3d at 764 (striking and tasing an unrestrained, subdued subject).

Like the subject in *Strain*, Timpa was suspected of only a minor offense. *See* 513 F.3d at 496. Timpa initially resisted arrest, similar to the subjects in *Strain* and in *Cooper*. *See Cooper*, 844 F.3d at 522; *Strain*, 513 F.3d at 496. Timpa, like the subject in *Darden*, was obese and forced to lie prone on his stomach with his hands restrained and bodyweight force applied to his back. *See* 880 F.3d at 733. As in *Darden*, Dillard had reason to believe that Timpa was struggling to breathe because Timpa told the Officers he took cocaine, which indicated a significant risk of excited delirium. *Id.* Most importantly, like the subjects in *Strain*, *Cooper*, and *Darden*, Timpa was subdued, unable to flee, and non-threatening during the continued use of force. *See Darden*, 880 F.3d at 733; *Cooper*, 844 F.3d at 523; *Strain*, 513 F.3d at 502.

The distinguishing facts between *Strain*, *Cooper*, *Darden*, and this case sharpen the excessiveness of Dillard's continued use of force. Unlike the subjects in *Cooper* and *Darden*, who were suspected of serious crimes, Timpa himself called the police asking for assistance. *See Darden*, 880 F.3d at 729;

*Cooper*, 844 F.3d at 522.  The officers had no intention of arresting him for any crime.  Whereas the defendant-officers in *Strain*, *Cooper*, and *Darden* ceased using force shortly after the subject was restrained, Dillard continued to kneel on Timpa's back for seven minutes after he was restrained at both the wrists and the ankles, including five minutes after he ceased moving his lower legs, and three-and-a-half minutes after he lost consciousness.  *See Darden*, 880 F.3d at 726; *Cooper*, 844 F.3d at 521; *Strain*, 513 F.3d at 496.  Here, the use of force lasted for over fourteen minutes as compared with the one-to-two minute dog bite in *Cooper*; the one-to-two minute use of a prone restraint with weight force in *Darden*; and the momentary use of force in *Strain*.  *See Cooper*, 844 F.3d at 521; *Strain*, 513 F.3d at 496; *Darden v. City of Fort Worth*, No. 4:15-CV-221-A, 2016 WL 4257469, at *5 (N.D. Tex. Aug. 10, 2016).  Finally, unlike the use of force in *Cooper* and in *Strain*, the use of a prone restraint with weight force resulted in the subject's death in *Darden* and again here.  *See Darden*, 880 F.3d at 732 n.8.  These cases clearly established the unreasonableness of Dillard's continued use of bodyweight force to hold Timpa in the prone restraint position after he was subdued and restrained.

This conclusion comports with the decisions of our sister circuits that have considered similar facts.  *See McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (holding that "it was clearly established in September 2012 that exerting significant, continued force on a person's back 'while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force'" (citation omitted)); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (holding that "the law was clearly established," by December 2002, "that applying pressure to [a subject's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions"); *Abdullahi v. City of Madison*, 423

F.3d 763, 764–66 (7th Cir. 2005) (holding that the record supported an inference of deadly force when an officer restrained a mentally ill individual in the prone restraint position with bodyweight force for thirty to forty-five seconds until the individual lost consciousness); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (holding that the law in April 2000 clearly established that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constituted excessive force"); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) (holding that the continued use of a prone restraint with weight force "despite [the arrestee's] repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance" constituted excessive force).[7]

The Officers argue that the Fifth Circuit "has held that [the use of a] prone restraint [on] a resisting suspect does not violate the Fourth Amendment even when pressure is applied to the suspect's back." We have never articulated this per se rule. Nor could we because the Supreme Court has specifically rejected exactly that rule. *See Lombardo*, 141 S. Ct. at 2241 (per curiam) (rejecting any per se rule that "the use of a prone restraint—no matter the kind, intensity, duration, or surrounding circumstances— is . . . constitutional so long as an individual appears to resist officers' efforts to subdue him"). The Officers mischaracterize our caselaw.

In *Castillo v. City of Round Rock*, an unpublished decision, we stated that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." No. 90-

---

[7] Only the Eighth Circuit has held in the reverse and the Supreme Court recently vacated that decision on the merits. *See Lombardo v. City of St. Louis*, 956 F.3d 1009 (8th Cir. 2020), *rev'd*, 141 S. Ct. 2239 (2021) (per curiam).

50163, 1999 WL 195292, at *4 (5th Cir. Mar. 15, 1999) (per curiam). But this statement cannot be unmoored from its factual context. There, Jesus Castillo, an unrestrained subject holding a beer bottle above his head, had "fought" and "struggl[ed] vigorously on the ground" against an officer's attempts to subdue him, leading "citizen bystanders . . . to aid in th[e] effort" of restraining him. *Id.* at *1. During the subsequent tussle, Castillo "blood[ied] the officer's nose[] in a manner that a reasonable officer could perceive as hostile." *Id.* at *3. Two officers then held Castillo in the prone restraint position with bodyweight force on his back for four to six minutes while restraints were applied. *Id.* at *1–2. But once Castillo was "handcuffed and leg-shackled, [and] finally stopped struggling, the officers rolled him over" into a recovery position. *Id.* at *2. The officers realized that Castillo "appeared to be unconscious" and immediately "rushed [him] to the hospital." *Id.* at *2–4.

By contrast, here, Dillard arrived on the scene to observe Timpa handcuffed on the ground—a factor that he was required to consider when determining how much force was reasonably necessary to prevent Timpa evading arrest or posing a threat of harm. *See Darden*, 880 F.3d at 732. Whereas we held that the officer in *Castillo* reasonably perceived the raising of a beer bottle as threatening, here, Dillard testified that he did not perceive Timpa was aiming to injure the Officers by kicking his legs. Whereas the officers placed Castillo in a recovery position as soon as he was restrained and subdued, Dillard failed to place Timpa in the recovery position for at least five minutes after he was restrained and subdued. And whereas the officers sought medical attention as soon as they realized that Castillo was nonresponsive, Dillard failed to seek medical attention for an additional three minutes after he recognized that Timpa was unconscious.

The Officers' citation to *Wagner v. Bay City* fares no better. *See* 227 F.3d 316 (5th Cir. 2000). There, Gilbert Gutierrez initiated a violent physical

altercation with the defendant-officers— "swinging his fists[] [and] striking" them. *Id.* at 318. The officers responded by using pepper spray and placing Gutierrez in the prone position with bodyweight force on his back while they applied handcuffs. *Id.* at 319. Once restrained, the officers placed Gutierrez face down in the prone position in the patrol car to be transported to jail. *Id.* at 323–24. We held that the use of force was reasonable because Gutierrez had violently continued to resist arrest during the officers' use of force and "there were no apparent physical signs that Gutierrez was substantially at risk" of asphyxiation. *Id.* at 324.

*Wagner* did not speak to the use of force at issue here—a prone restraint with bodyweight force while Timpa was restrained and subdued. *See* 227 F.3d at 324. Unlike Gutierrez, Timpa never engaged the Officers in a violent altercation; rather, he was already handcuffed by the time that Dillard arrived on the scene. In *Wagner*, the defendant-officers responded to Gutierrez's diminished resistance by removing their bodyweight from his back. *See* 227 F.3d at 319. Here, Dillard continued to exert asphyxiating force by kneeling on Timpa's upper back long after he had gone limp. And unlike the absence of physical signs of substantial risk of asphyxiation in *Wagner*, Dillard was aware that Timpa was obese and had used cocaine, which exacerbated the risk of asphyxiation.

Neither *Wagner* nor *Castillo* stands for a per se rule that the use of a prone restraint is objectively reasonable so long as the subject is resisting. Like any other tool of control, a prone restraint may rise to unconstitutional force depending on when and how it is used. *See Aguirre*, 995 F.3d at 411–12, 424 (Jolly, J., concurring), 424 (Higginson, J., concurring) (holding the use of a maximal prone restraint with bodyweight pressed against a subject's torso and legs constituted excessive force in violation of the Fourth Amendment); *Darden*, 880 F.3d at 733 (holding it was objectively unreasonable for an officer to "force[] . . . an obese man . . . onto his

stomach, push[] his face into the floor, and pull[] [his] hands behind his back" where the arrestee was not "actively resisting" arrest); *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (holding the use of a prone restraint with bodyweight force pressed on a pre-trial inmate's back and neck constituted "grossly disproportionate" force in violation of the Fourteenth Amendment).

Here, a prone restraint was used in tandem with Dillard's body weight for over fourteen minutes. If a jury were to find that Timpa was subdued and nonthreatening by nine minutes into the restraint, then the continued use of force for five additional minutes was necessarily excessive. *Cf. Aguirre*, 995 F.3d at 424 (Jolly, J., concurring) (denying qualified immunity as to the last two minutes of a maximal prone restraint); *Roque v. Harvel*, 993 F.3d 325, 335–36 (5th Cir. 2021) (granting qualified immunity for the first shot fired by an officer, but denying as to the second and third shots fired two and four seconds later, respectively); *Cooper*, 844 F.3d at 521 (denying qualified immunity as to the final one-to-two minutes of a dog bite). We recognize that our police officers are often asked to make split-second judgments about the use of force, but the Constitution demands that officers use no more force than necessary and "hold[s] [them] accountable when they exercise power irresponsibly." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because the state of the law in August 2016 had clearly established that the continued use of force against a restrained and subdued subject violates the Fourth Amendment, Defendant-Officer Dillard is not entitled to qualified immunity.

## IV.

We now consider the bystander liability claims against Officers Dominguez, Vasquez, Mansell, and Rivera. Within the Fifth Circuit, "[a]n officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at

the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Bartlett*, 981 F.3d at 343. The Plaintiffs again bear the burden to demonstrate that the state of the law in August 2016 clearly established that "any reasonable officer would have known that the Constitution required them to intervene" in this circumstance. *Id.* at 345.

Plaintiffs contend that *Hale v. Townley* provided fair notice to Dominguez, Vasquez, Mansell, and Rivera of their constitutional duty to intervene. *See* 45 F.3d 914 (5th Cir. 1995). In *Hale*, we held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Id.* at 919. There, a defendant-officer "stood by and laughed" while another officer assaulted Billy Hale. *Id.* at 917. We agreed that liability under § 1983 attaches when a bystander-officer "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Id.* at 919. The officers had a reasonable opportunity to intervene because they were "present at the scene" and their laughter supported an inference of "acquiescence in the alleged use of excessive force." *Id.*

We begin with Vasquez and Dominguez. It is undisputed that each Officer stood mere feet away from Timpa throughout the fourteen-minute duration of the restraint. Each Officer was trained to "ensure that[,] as soon as subjects are brought under control, they are placed in an upright position . . . or on their side." Both testified that they were aware of the risks of holding an arrestee in the prone restraint position. The Officers do not contend that Vasquez or Dominguez lacked reasonable opportunity to intervene. Indeed, both officers stood by, observed Timpa suddenly lose consciousness, expressed surprise, and then made jesting comments. That both officers "stood by and laughed" while Dillard continued to kneel on an incapacitated arrestee supports an inference of "acquiescence in the alleged

use of force." *Hale*, 45 F.3d at 917, 919. Questions of fact preclude summary judgment as to the bystander liability claims against Vasquez and Dominguez.

We now turn to Supervising Officer Mansell and Rivera. Bystander liability is available only when an officer is present during an alleged constitutional violation. *See Bartlett*, 981 F.3d at 343. The Officers contend that Mansell and Rivera were absent when Timpa became subdued and thus, neither officer can be liable for failing to intervene. The record supports that Rivera left the scene approximately two-and-a-half minutes before Timpa stopped moving his legs and that he remained absent until after Dillard released the restraint. Rivera thus lacked a reasonable opportunity to intervene and is entitled to qualified immunity.

Mansell presents a tougher case. Thirty-four seconds *after* Timpa became subdued, he returned to his patrol car "a few feet away" and sat "with the car door open" while he ran a check on Timpa's license. He testified that he did not hear Vasquez and Dominguez mock Timpa for losing consciousness. But he was observing Timpa for the critical half-minute when Timpa suddenly lost consciousness. Moreover, the record supports an inference that Mansell was aware Timpa had become incapacitated. When Timpa lost consciousness, Dominguez said to Mansell: "So what's the plan? You're [in charge] out here, sir." Mansell responded that the officers should "strap [Timpa] to the gurney" and then made jesting comments before stepping away to check Timpa's license. A jury could find that Mansell remained present on the scene and acquiesced in the violation of Timpa's Fourth Amendment rights.

Genuine disputes of material fact preclude summary judgment on the claims of bystander liability against Officers Mansell, Dominguez, and Vasquez. Summary judgment was properly granted to Officer Rivera.

*    *    *

No. 20-10876

We REVERSE the district court's grant of summary judgment on the claim of excessive force against Officer Dillard and the claims of bystander liability against Officers Mansell, Vasquez, and Dominguez.

We AFFIRM the district court's grant of summary judgment on the claim of bystander liability against Officer Rivera.