# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00701-COA

**MONICA LEE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF DAMIEN CAMERON, DECEASED, AND ALL OF THE HEIRS AT LAW AND WRONGFUL DEATH BENEFICIARIES OF DAMIEN CAMERON**  APPELLANTS

v.

**RANKIN COUNTY, MISSISSIPPI, HUNTER THOMAS ELWARD AND LUKE AARON STICKMAN**  APPELLEES

DATE OF JUDGMENT:              05/14/2024
TRIAL JUDGE:                  HON. M. BRADLEY MILLS
COURT FROM WHICH APPEALED:    RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:     TRENT L. WALKER
                              CATOUCHE JUDGE BODY
                              MALIK Z. SHABAZZ
ATTORNEY FOR APPELLEES:       JASON EDWARD DARE
NATURE OF THE CASE:           CIVIL - WRONGFUL DEATH
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              REMANDED IN PART - 05/05/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND WEDDLE, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     This appeal originates from the July 2021 death of Damien Cameron, following his arrest by Rankin County Sheriff's Department deputies.  Damien's mother, Monica Lee, individually and on behalf of Damien's heirs at law and wrongful death beneficiaries ("Plaintiffs" or "Appellants"), filed suit against Rankin County, Mississippi; Pafford Medical Services of Mississippi Inc.; Pafford Emergency Medical Services Inc.; and Doe Defendants

1-10, two of whom were substituted. *See infra* ¶15.

¶2. In May 2024, the Circuit Court of Rankin County granted summary judgment in favor of Defendants Hunter Elward and Luke Stickman, in their individual capacities, holding that they were entitled to qualified immunity from the Plaintiffs' claim alleging a Fourth Amendment excessive-force violation under 42 U.S.C. § 1983. The court also granted summary judgment to Rankin County based on its immunity under the Mississippi Tort Claims Act ("MTCA") for the same claim. The Plaintiffs appeal that judgment, as well as the court's denial of their second motion for leave to amend the Plaintiffs' complaint.

¶3. Finding there are genuine issues of material fact whether Elward and Stickman were entitled to qualified immunity, we reverse the circuit court's order granting summary judgment as to those Defendants and remand to the circuit court for further proceedings. We also reverse and remand the court's granting of summary judgment on the MTCA claims. However, we find no error in the circuit court's denial of the Plaintiffs' motion for leave to amend the complaint.

**Factual Summary**

¶4. At approximately 8:02 p.m. on July 26, 2021, Deputy Elward was dispatched to 132 Foote Drive, Braxton, Mississippi, in response to a complaint that a male suspect had broken into and vandalized a residence; it was unknown if items were missing. The dispatch report noted that the suspect had run into nearby woods and "was acting high and paranoid."[1] Deputy Elward radioed to dispatch that the suspect had "tore up" some things and may have

---

[1] A toxicology report later indicated Damien had methamphetamine in his system.

2

possibly taken a "shotgun."

¶5.  Deputy Elward was informed that the suspect was a nearby resident, Damien Cameron, who was also called "Toot." Monica Lee, Damien's mother, who had been alerted about Damien's behavior, arrived at the vandalized residence. Lee talked with Deputy Elward and allowed him to follow her home to 147 Foote Drive, where Damien lived with Lee and her parents. Lee warned the deputy that Damien was "paranoid" and would probably run from him.

¶6.  Damien was not at home when they arrived; so Deputy Elward went outside to his truck. It was then that the deputy observed someone emerging from the nearby woods. According to Elward, "[t]he subject fit the description given to me, his mother confirmed his identity by pointing at him and yelling that's him, that's Toot." When the deputy "yelled his name, [Damien] took off running behind the house." Deputy Elward pursued Damien, repeatedly instructing him to turn around and put his hands behind his back and warning Damien he would be tased if he did not comply. However, Damien kept running toward the back door; so Deputy Elward "deployed his taser striking the suspect in the center of his back." Damien fell down onto the steps. When the deputy attempted to handcuff him, Damien got back up and ran into the house; so Deputy Elward tased him a second time "with little or no effect." Damien pulled the taser prongs out and ran through the house toward a bedroom. Meanwhile, Damien's grandfather, James Cameron (Cameron), was pleading with Damien to comply with the deputy's instructions.

¶7.  Damien and Deputy Elward "tussled" in the house during the deputy's attempt to

3

subdue and handcuff Damien. Deputy Elward admitted to striking Damien twice "at or near his left eye" with his closed fist, but the deputy claimed that Damien was trying to "punch" him. As the two men continued to tussle on the floor, Deputy Elward was able to get one handcuff on Damien while rolling him to a prone position. However, Damien had his other hand underneath his stomach, making it difficult for Deputy Elward to handcuff him.

¶8. Deputy Stickman arrived at this point to assist Deputy Elward. Lee and both of her parents asserted that Deputy Stickman got down and kneeled on the back of Damien's neck to restrain him, although Lee acknowledged that she had not mentioned that fact in her initial statement to law enforcement. According to Betty Cameron, Damien's grandmother:

> The man [(Elward)] had him down on the floor beside my bed and my dresser. His head was down in front of my dresser with his knee in [Damien's] back. This other policeman came in . . . . He kneeled down on Toot. . . . That's what I always call [Damien]. He kneeled down on the side of his head and his neck with his knee, and [Damien] kept saying he couldn't breathe.

Deputy Stickman, however, stated in his report that he was "on the balls of my feet with my knees slightly on his back with not much pressure so he can't roll over, stand up." Cameron testified that from the time Deputy Stickman arrived until they got Damien in handcuffs was "longer than a minute."

¶9. According to the statements given by Lee and Cameron to agents with the Mississippi Bureau of Investigations (MBI), Damien began complaining at that point that he was unable to breathe. Lee also observed that Damien's eye was bleeding and "swelling shut." After handcuffing Damien, the deputies pulled him to his feet. Cameron stated, "They had to drag him up off – both of them picked him up off the floor because he kept telling them he

4

couldn't breathe." Lee and her parents said that Damien "walked out" of the house with the deputies on either side of him, with Cameron initially stating that Damien was "kind of pushing back." However, Cameron later clarified that Damien was walking "[w]ith the help of them on each side holding him up," asserting:

> Sir, the way I see it, you just too weak to walk after the police had got off his neck and had him up. If he had, was walking back out of breath and half knocked out, he's going to have to be holding back if they have to hold him up for him to walk.
>
> . . . .
>
> Damien couldn't have walked out of there by himself without some help.

While taking him to the patrol car, the deputies stated in their reports that Damien would occasionally drop to the ground; so they would have to pull him back up.[2] Elward's report noted:

> We made it to my patrol unit and tried to get him in back seat[,] but he would go back and forth from resisting and kicking, to dropping himself to the ground[,] and we tried 6 or 7 times to pick him up into the back seat but from the rain and mud[,] and his strong resistance, he would wiggle his way back to the ground. At this point he just sat there for a minute so myself and Deputy Stickman might recover as well.

Betty also stated in her deposition that she saw Damien "fall to the ground." In her statement to MBI, Lee claimed that Damien "told them he was tired" and could not breathe. Lee also said, "I asked them could I get my son some water. [(Deputy Elward said)] 'No, he don't want no water. He just don't want to get in the f\*\*king truck.'" Lee later stated during her

---

[2] In contrast to her prior statements, Lee asserted in an affidavit almost two years later that the officers had left Damien lying in the mud "face down" for "ten to twenty minutes" and that "Damien never moved." The court later disregarded that affidavit as a "sham" because it was "so inconsistent with her prior deposition."

5

deposition that Damien had asked her "for a drink of water."

¶10.   Deputy Stickman reported, "After a short time, Deputy Elward was able to pick the suspect up and place him halfway into the vehicle." Deputy Stickman claimed that when Damien would not put his feet in the car, Deputy Elward used Deputy Stickman's taser to "drive stun" Damien in the thigh to get him to comply.[3] Lee was not an eyewitness to the officers' placing Damien in the patrol car, but Cameron testified in his deposition, "When they went to put him in the car, they didn't turn him around and sit him down. They shoved him up in there." When asked if he could see Damien in the patrol car, Cameron replied, "No, when they put him in there, they throwed him in there. He was handcuffed, so he had to fall on his face on the seat . . . . [H]e wasn't sitting up because he was [lying] down on the seat or in the floorboard somewhere back there."

¶11.   Once Damien was in the back of the patrol car, the officers went inside to gather their equipment and talk to Damien's mother. She also said Deputy Elward advised her to talk to the chancery clerk about getting Damien "some help."

¶12.   When Deputy Elward came back out to the truck, he observed Damien "slumped over the seat" with no pulse. Deputy Elward performed CPR on Damien until emergency medical services arrived, but Damien was later pronounced deceased at the hospital. An autopsy by the state's medical examiner found that Damien's blood contained "methamphetamine and

---

[3] "The drive stun technique involves placing the end of the Taser directly on the person, without the cartridge containing the metal probes . . . . Each application of the drive stun technique delivers a jolt of electricity for about five seconds." *Carroll v. Ellington*, 800 F.3d 154, 164 (5th Cir. 2015). "A taser in drive-stun mode inflicts a painful electric shock on contact, but does not cause the same seizing effect" as "[w]hen taser prongs are deployed." *Cloud v. Stone*, 993 F.3d 379, 382 n.2 (5th Cir. 2021).

6

amphetamine" and that his body had suffered "[m]ultiple subcutaneous and soft tissue hemorrhages." The cause and manner of death were "Undetermined."

## Procedural History

¶13. On behalf of the Decedent's estate and his wrongful-death beneficiaries (the Plaintiffs),[4] Lee filed a complaint on March 25, 2022, against Defendants Rankin County, Mississippi; Pafford Medical Services of Mississippi Inc.; Pafford Emergency Medical Services Inc.; and Doe Defendants 1-10. The complaint alleged federal claims under 42 U.S.C. § 1983 (i.e., violation of rights by excessive force and denial of medical care) and state law claims brought under the MTCA.[5] Rankin County filed an answer and a Rule 12(c) motion for partial judgment on the pleadings on May 5, 2022. *See* M.R.C.P. 12(c). Specifically, Rankin County argued that the complaint did not allege any facts to support the elements of a § 1983 claim under *Monell v. N.Y.C. Department of Social Services*, 436 U.S. 658 (1978).[6]

¶14. An agreed order staying the case was entered on July 19, 2022, pending resolution of the "ongoing criminal case related to the facts at issue in this litigation." On October 18, 2022, the court lifted the stay. The court's agreed amended scheduling order entered on

---

[4] Lee stated in her deposition that Damien did not have any children.

[5] An agreed order of dismissal with prejudice was entered against Pafford Medical on June 2, 2022, and the record indicates that Lee settled her claim with Pafford Medical for $10,000.

[6] In *Monell*, the United States Supreme Court held "that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. "[I]n other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.*

7

October 18, 2022, mandated that "[a]ll discovery, including discovery and trial depositions, shall be completed on or before May 23, 2023," and "[a]ll … motions … shall be filed no later than June 23, 2023, and shall be deemed abandoned unless heard on or before August 23, 2023."

¶15. After being granted leave by the circuit court, the Plaintiffs filed an amended complaint on December 16, 2022, substituting Elward and Stickman for Doe Defendants 1 and 2. Rankin County filed its answer and a renewed motion under Rule 12(c), and Elward and Stickman filed an answer and a "Motion for Judgment on the Pleadings, or alternatively, Motion for Summary Judgment Premised on Qualified Immunity" on January 25, 2023. Rankin County filed a motion for summary judgment on March 3, 2023.

¶16. The circuit court entered an order, granting in part and denying in part the Defendants' pending motions on August 8, 2023, holding: "For all the above-mentioned reasons, the Court finds that the following claims should remain: the Fourth Amendment excessive force claims against the individual defendants and the negligence claim against Rankin County."[7] The court determined, "The [c]ourt finds that, on the facts pled, the authorities contained in *Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021) provide the required 'clearly established law.' *Timpa* highlights case law holding that use of force after a detainee has been subdued is unconstitutional."

¶17. In the meantime, represented by new counsel, the Plaintiffs filed a motion for leave to file a second amended complaint on July 18, 2023, "to add claims that are essential for

---

[7] The circuit court dismissed Lee's claim of denial of medical care brought under the Eighth Amendment.

justice in this cause." Rankin County opposed the motion, noting that it was filed twenty-five days after the June 23 motion deadline established in the scheduling order.

¶18. On August 31, 2023, the Plaintiffs moved to amend the circuit court's scheduling order. The court held a hearing on September 13, 2023, after which the court entered an amended scheduling order on September 26, 2023, mandating the following deadlines: (1) October 30, 2023 – Deadline to Propound Discovery, (2) November 10, 2023 – Plaintiff's Expert Designation Deadline, (3) December 8, 2023 – Defendants' Expert Designation Deadline, (4) December 31, 2023 – Discovery Deadline, and (5) January 5, 2024 – Motion(s) Deadline.

¶19. On October 19, 2023, the Plaintiffs filed a notice to set a hearing on November 15, 2023, concerning their second motion for leave to amend the complaint. On November 21, 2023, the circuit court denied the July 18, 2023 motion for leave to amend on the basis of "undue delay, failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment."[8]

¶20. The court entered another amended scheduling order on December 21, 2023, mandating that "[a]ll dispositive motions and all challenges to expert testimony/evidence . . . shall be filed no later than February 2, 2024, and shall be deemed abandoned unless heard

---

[8] The Plaintiffs filed a motion to reconsider the order on December 1, 2023. In April 2024, they noticed the motion for reconsideration for a hearing on May 15, 2024. The record does not indicate that the circuit court ruled on this motion to reconsider, presumably since the motion was rendered moot based on the court's granting of summary judgment in favor of the Defendants.

on or before March 13, 2024." Defendants Rankin County, Elward, and Stickman subsequently filed a joint motion for summary judgment on February 2, 2024, asserting that "Elward and Stickman are entitled to qualified immunity as to Plaintiffs' federal § 1983 claims" and that "Rankin County is immune from Plaintiffs' state law claim pursuant to [Mississippi Code Annotated section] 11-46-9(1)(c)."[9]

¶21. The Plaintiffs filed a response to the Defendants' summary-judgment motion, asserting:

> Taking the facts in the light most favorable to the non-movant plaintiffs, there is at least an issue of fact as to whether the actions of the deputies, jointly and severally, lead to his injury and death, both from his "tussle" with Deputy Elward and its attendant result in Elward repeatedly punching Cameron in his face and body, and the positioning of his body weight on a prone Damien Cameron, as well as from the resultant asphyxiation which occurred after Deputy Stickman knelt on Cameron's neck.

They claimed that this "excessive pressure" to Damien's neck, despite his "repeated entreaties that he could not breathe[,] . . . resulted in hemorrhaging according to the State Medical Examiner, and asphyxiation, which was directly the cause of death according to

---

[9] Section 11-46-9(1)(c) states:

(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

. . . .

(c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury[.]

Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2019).

10

Plaintiff[s'] expert, Dr. [Shandelle] Norford." The Plaintiffs further argued, "Even if plaintiff was actively resisting arrest, his act of resistance should not have resulted in his death," citing *Simpson v. City of Pickens*, 887 F. Supp. 126, 130 (S.D. Miss. 1995), a case in which the district court found that "it is possible for a finding that [the plaintiff victim] was resisting arrest to coexist with a finding that the police used excessive force to subdue him." Lastly, in support of the state law claim under the MTCA, the Plaintiffs claimed that Damien was not engaged in criminal activity and that the officers' actions (i.e., kneeling on Damien's back and neck to subdue him) constituted a violation of department policy[10] and were the proximate cause of Damien's death.

¶22. On May 14, 2024, the circuit court entered an order granting the Defendants' motion for summary judgment. The court held that "the plaintiffs could not show a constitutional violation, and if they could, the plaintiffs have not identified clearly established law," finding *Simpson*, the case cited by the Plaintiffs, "inapplicable." Additionally, the court concluded that because the deputies' actions were objectively reasonable, there could be no MTCA state

---

[10] The Rankin County Sheriff's Department's "Use of Force Policies and Procedures" states:

> Choke holds are strictly forbidden except only in deadly force situations. Choke holds are defined as but not limited to any method by which a person applies sufficient pressure to a person to make breaking difficult or impossible and includes any pressure on the neck, throat or windpipe that may prevent or hinder breaking or reduce the intake of air. Choke holds also include applying pressure to a person's neck to stop the flow of blood to the brain.

Addressing these policies, Sheriff Bryan Bailey acknowledged in his deposition that it "would have been a violation of this policy," if the evidence showed that one of his deputies applied force to Damien's neck with his knee in the attempt to arrest him.

11

law action, since they could not act with reckless disregard for the decedent's rights if they had already been found to have acted objectively reasonably.

¶23. The Plaintiffs appeal the circuit court's order, as well as the court's order denying the July 18, 2023 motion for leave to amend the complaint.

## Discussion

### I. Whether the circuit court erred in granting the Defendants' motion for summary judgment on the issue of qualified immunity.

#### A. *Standard of Review*

¶24. Mississippi Rule of Civil Procedure 56(c) provides that the court shall render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "The moving party has the burden of demonstrating that there is no genuine issue of material fact in existence, while the non-moving party should be given the benefit of every reasonable doubt." *Elkins v. McKenzie*, 865 So. 2d 1065, 1071 (¶21) (Miss. 2003). "Summary judgment on claims raised pursuant to § 1983 is reviewed de novo as any other summary judgment to inquire if the trial court properly granted the motion for summary judgment." *Id.* (citing *Tucker v. Hinds County*, 558 So. 2d 869, 872 (Miss. 1990)).

#### B. *Qualified Immunity*

¶25. In *Elkins*, the supreme court addressed the scope of a defense of qualified immunity, explaining:

> Qualified immunity protects government officials who perform discretionary

12

functions from liability "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." The qualified immunity analysis is a two-step process. First, a court must determine whether the plaintiff has alleged the violation of a constitutional right. Second, if the plaintiff has alleged a constitutional violation, the court must decide if the conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." This means that "even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity."

*Elkins*, 865 So. 2d at 1076 (¶37) (citations and internal quotation marks omitted) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001)). Thus, plaintiffs bear the burden to rebut a defense of qualified immunity "by establishing that the official's allegedly wrongful conduct violated clearly established law." *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 980 (¶19) (Miss. 2004). "Vague or general assertions of constitutional deprivations are not sufficient, and a § 1983 plaintiff must state with specificity the constitutional right he alleges has been violated." *Williams v. Lee Cnty. Sheriff's Dep't*, 744 So. 2d 286, 292 (¶12) (Miss. 1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

¶26. In granting summary judgment for the Defendants, the circuit court concluded that the Plaintiffs had failed to demonstrate "a constitutional violation and have not provided a case to show that the law in this context was clearly established." As discussed, the court found

13

the singular case cited by the Plaintiffs to be "inapplicable."  The court noted its reliance on *Timpa* in its August 2023 ruling on the motions to dismiss, but explained that "now the record shows active resistance during the use of force" and that "*Timpa* by contrast is about continued force when resistance stopped and the individual fully restrained."  Thus, the court concluded with regard to the excessive-force claim against Elward:

> Plaintiffs cannot show a constitutional violation by Elward.  Considering the evidence in the light most favorable to the non-moving party and given the circumstances of this case, where Damien fled from Elward, was non-compliant, was warned about being tased and ignored the warning, remained unfazed after being tased, physically struggled with Elward until Stickman arrived on scene, and where Elward did not use force after Damien was restrained and subdued, the Court is unable to say Elward's use of force was excessive.

(Emphasis added).  The circuit court was also "unable to say Stickman's use of force was excessive," as "Stickman's application of force was only way Damien was ultimately restrained and subdued and . . . Stickman did not use force after Damien was restrained and subdued[.]"

¶27.   The Appellants argue that the court erred because "the actions of deputies Elward and Stickman were objectively unreasonable under clearly established law."  Specifically, they note the deputies' application of force to Damien's "back and neck beyond the time that he no longer had any reasonable means of evading custody, and did not pose a threat of immediate harm."  The Appellants assert, "[T]he question is whether deputies Stickman and Elward had fair warning in 2021 that the state of the law was that their acts of kneeling on the back and neck of Damien Cameron, inhibiting his ability to ventilate was unconstitutional."

14

*i. Whether Plaintiffs clearly established a constitutional violation.*

¶28. The United States Supreme Court has held, "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

¶29. In their response to the Defendants' motion for summary judgment, the Plaintiffs cited *Simpson v. City of Pickens* in support of their claim that Elward's and Stickman's actions were objectively unreasonable and constituted excessive force. As noted, *Simpson* held that "it is possible for a finding that [the plaintiff] was resisting arrest to coexist with a finding that the police used excessive force to subdue him." *Simpson*, 887 F. Supp. at 129. However, the circuit court determined in its order that *Simpson* does not provide "the requisite notice that the use of force in a particular situation qualifies as excessive."

¶30. The court also found that its prior reliance on *Timpa* was not relevant to the facts of this case because Damien was actively resisting arrest "during the use of force." In *Timpa*, Officer Dustin Dillard used body-weight force to kneel on a mentally ill man experiencing an "excited delirium"—this force lasted approximately fourteen minutes after the subject had been subdued, and the subject became unresponsive and died at the scene. *Timpa*, 20 F.4th at 1025-26, 1031. The United States Court of Appeals for the Fifth Circuit reversed the district court's order granting summary judgment to Dillard on the basis of qualified immunity, holding:

The district court determined that no precedent clearly established that the use of a prone restraint with bodyweight force to bring a subject under police control was objectively unreasonable. But the district court failed to consider the continued use of such force after Timpa had been restrained and lacked the ability to pose a risk of harm or flight. We hold that the state of the law in August 2016 had clearly established that the continued use of force against a restrained and subdued subject violates the Fourth Amendment.

*Id.* at 1038 (emphasis omitted).[11] "If a jury were to find that Timpa was subdued and nonthreatening by nine minutes into the restraint, then the continued use of force for five additional minutes was necessarily excessive." *Id.* Although the circuit court in this case found that Damien's "active resistance" makes *Timpa* inapplicable to these facts, we note that the Fifth Circuit in *Timpa* clarified:

> The Officers argue that the Fifth Circuit "has held that the use of a prone restraint on a resisting suspect does not violate the Fourth Amendment even when pressure is applied to the suspect's back." *We have never articulated this per se rule. Nor could we because the Supreme Court has specifically rejected exactly that rule. See Lombardo* [*v. City of St. Louis*], [594 U.S. 464, 467-68 (2021)] (per curiam) (rejecting any per se rule that "the use of a prone restraint—no matter the kind, intensity, duration, or surrounding circumstances—is . . . constitutional so long as an individual appears to resist officers' efforts to subdue him"). The Officers mischaracterize our caselaw.
>
> . . . .
>
> Like any other tool of control, a prone restraint may rise to unconstitutional force depending on when and how it is used.

*Timpa*, 20 F.4th at 1037-38 (emphasis added). *In Lombardo*, the United States Supreme Court found that "[s]uch a per se rule would contravene the careful, context-specific analysis required by this Court's excessive force precedent." *Lombardo*, 594 U.S. at 468.

---

[11] The Appellees correctly note that *Timpa* was decided after the conduct at issue, but it was clearly stated in the decision that the applicable law was established in 2016.

¶31.    The Appellants argue in their brief that the circuit court erred by ignoring "significant

Fifth Circuit and federal case law regarding excessive force, including *Timpa v. Dillard*, the

case that the trial court had initially relied on in denying the defendants' Motion to Dismiss."

They contend that cases such as *Timpa*; *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th

Cir. 2003); and *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), provide the

requisite clearly established law.

¶32.    In *Drummond v. City of Anaheim,* 343 F.3d 1052, 1053-54 (9th Cir. 2003), which was

cited in *Timpa*, police officers attempted to take an unarmed, mentally ill man into custody

and transport him to a medical facility for his own safety; however, the manner in which they

subdued and restrained him resulted in his falling into a coma and a permanent vegetative

state.  Two officers put their knees on Drummond's back and placed the weight of their

bodies on him, with one officer placing a knee on Drummond's neck.  *Id*. at 1054.

Eyewitnesses verified Drummond repeatedly told officers that he could not breathe and that

they were choking him.  Drummond also asked for water, but the officers "continued to put

their weight upon Mr. Drummond's back and neck."  *Id*. at 1054-55.  Drummond lost

consciousness, "sustained brain damage[,] and fell into a coma."  *Id*. at 1055.

¶33.    Like the circuit court in this case, the district court in *Drummond* granted summary

judgment to the defendants, "finding both that there was no constitutional violation by any

defendant, and that even if there were a violation, the law was not sufficiently clearly

established that a reasonable officer would have known the conduct to be unconstitutional."

*Id*.  Reversing the district court on appeal, the Ninth Circuit found that "the force allegedly

employed was severe and, under the circumstances, capable of causing death or serious injury." *Id*. at 1056. "Under similar circumstances, in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id*. at 1056-57.

¶34. In *Gutierrez*, the Fifth Circuit held that officers were not entitled to qualified immunity at the summary-judgment stage after they had "hog-tied" a man who appeared to be on some type of drugs. *Gutierrez*, 139 F.3d at 445-52. Citing a medical study,[12] the Fifth Circuit found that hog-tying becomes deadly force in certain circumstances—"when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Id*. at 446-47, 451. As a result, the Fifth Circuit determined that absent a threat of serious physical harm, "hog-tying in [those] circumstances would have violated law clearly established prior to November 1994." *Id*. at 446-47. Considering whether those circumstances were present, the Fifth Circuit noted "many material disputes of fact, such as (1) whether the officers believed that Gutierrez was "under the influence of drugs" or "a person experiencing psychiatric problems"; (2) whether officers placed Gutierrez face down or on his side; (3) whether the police department had "warned its officers of the possible dangers of hog-tying in these circumstances prior to November 1994"; and (4) "whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others." *Id*. at 448-49. The Fifth Circuit found these material disputes of fact made it impossible to

---

[12] Gutierrez cited "*San Diego Police Department, Final Report of the Custody Death Task Force* (unpublished, June 1992)," noting that the study found "Sudden Custody Death Syndrome" was "caused by the combination of (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying or carotid choke holds." *Gutierrez*, 139 F.3d at 446.

determine whether the officers' actions were objectively reasonable, precluding summary judgment on a Fourth Amendment claim based on qualified immunity. *Id*. at 449.

¶35.     As discussed by the Appellants in their brief, there is clearly established law that applying pressure or body-weight force to a prone suspect could constitute excessive force under certain circumstances; so we will proceed to address the second issue—whether the deputies' actions were objectively reasonable in light of this clearly established law.

> ii.     *Whether the deputies' conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred.*

¶36.     In determining the reasonableness of the deputies' actions, the circuit court stated that it considered the following factors as stated in *Graham v. Connor*, 490 U.S. 386 (1989): "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.[13] "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham*, 490 U.S. at 396). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*.

### a.     The Severity of the Crime at Issue

---

[13] Although Lee asserts that other factors cited in *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), should be considered in determining the reasonableness of the use of force (e.g., "any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue"), we note that the United States Supreme Court in *Kingsley* was specifically addressing "the appropriate standard for a pretrial detainee's excessive force claim." *Id*. Therefore, we find those additional factors to be inapplicable in this instance.

19

¶37. The Plaintiffs asserted in the initial complaint that the crime at issue involved "nominal alleged property damage." The court noted that Deputy Elward was responding "to a vandalism call." Elward's incident report stated that Damien entered the neighbor's house and began "busting holes in the wall with a pipe and tearing at it with hands." The report also noted Damien "was acting extremely 'out of it.'" Sheriff Bailey later noted in his deposition that Damien's actions "would have been a felony malicious mischief case."

¶38. Although Elward reported to dispatch, and averred in his affidavit, that he was told Damien may have stolen a shotgun, Elward did not mention this fact in the incident report; nor was any firearm found at Lee's residence. The circuit court also did not mention the possibility that Damien had a firearm; so it does not appear that the court considered the possible presence of a firearm as determinative to its findings.

¶39. The Appellants argue that "the nature of the crime at issue does not mitigate toward the force ultimately exerted by Deputies Elward and Stickman." But as the Appellees note, "Damien was highly intoxicated, had broken into and destroyed the inside of a neighbor's house, possibly stolen a firearm from the neighbor's house, and fought with Elward in his attempted flight from the officer." Sheriff Bailey further testified that once Damien failed to comply with Elward's instructions, "it would have been a disorderly conduct charge along with the felony malicious mischief he was investigating."

¶40. We find that this factor favors a finding that the officers' actions were objectively reasonable.

**b.    Whether Damien posed an immediate threat to others.**

20

¶41.   The Appellants assert that Damien posed no immediate threat to the officers or his family, noting Damien's attempt to flee from Elward.  Yet Elward claimed in his affidavit he was told that Damien may have stolen a "shotgun" during his vandalism of the neighbor's home, and it was further reported that Damien was "high and paranoid."  Elward also claimed Damien tried to "punch" him while they were tussling, but there is no other testimony to support Elward's claim.

¶42.   As the Appellants note, however, Elward has since been convicted of falsifying incident reports, among other serious crimes, of which the circuit court would have been aware at the time the court issued its final order.  We find that there exists a material fact in dispute as to whether Damien posed an immediate threat to Elward or others.

### c.   Whether Damien was actively resisting arrest or attempting to evade arrest by flight.

¶43.   The Appellants do not dispute that Damien initially was actively resisting arrest and/or attempting to evade arrest by flight.  However, they contend that "it is not readily apparent that the crime for which [Damien] was sought, vandalism, would arise to the level of felony, and his activity was surely of a non-violent nature."

¶44.   Appellants also argue "it would be a question of fact as to whether [Damien's] continued resistance was actually 'resistance' or movement to try to position himself to be able to breathe" and "is only one factor to be considered in determining the constitutionality of the actions of Elward and Stickman."  Caselaw supports the Appellants' argument.  In *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018), the United States Court of Appeals for the Fifth Circuit found that it was a question of fact for a jury to determine

whether the deceased was resisting arrest or "was merely trying to get into a position where he could breathe."

¶45.    Finding merit to the Appellants' argument, we conclude there is a material and disputed fact as to when Damien ceased resisting arrest.  Cameron, Damien's grandfather, claimed:

> And by that time the other police, the backup that came, he run in and got down across [Damien's] back and had one of his - - his knee on the back of [Damien's] neck right there.  That's when [Damien] was saying, I can't breathe, sir.  Let me up.  I can't breathe.  Please let me up.

Betty, Damien's grandmother, also said that Damien repeatedly told the deputy that "he couldn't breathe."  Elward and Stickman reported that when walking to the car, Damien repeatedly dropped to the ground (e.g., "the suspect continued to pull away and followed by dropping to the ground"), but they characterized his actions as resisting arrest.  However, family members characterized Damien's falling to the ground as his being "too weak to walk," particularly noting his reported trouble breathing once the officers had knelt on his neck and back.

¶46.    We further find other material disputed facts precluding the granting of summary judgment on these claims.  Taking into account the consistent testimony by Lee and her parents that Damien repeatedly told the deputies that "he couldn't breathe" after both deputies subdued him by using their body weight to kneel on his back and neck,[14] we find there was a genuine issue of fact whether these actions constituted a prohibited "choke hold"

---

[14] *See Darden*, 880 F.3d at 727 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986))).

under the County's policies and procedures and were excessive force in violation of the Fourth Amendment.

¶47.    We also find that whether Stickman knelt on Damien's neck was clearly a disputed material fact in this case.  Lee and her parents told MBI agents that Stickman put his knee on Damien's neck (e.g., "He kneeled down on the side of his head and neck with his knee.") Stickman, however, claimed that he was kneeling on the side of Damien, "on the balls of my feet with my knees slightly on his back with not much pressure so he can't roll over, stand up."  While the circuit court mentioned Lee's testimony regarding Stickman's kneeling on Damien's neck, the court did so only with regard to Lee's so-called "sham" April 2023 affidavit.  The court further determined that Lee's subsequent deposition testimony was not consistent with her affidavit.  The court, however, did not address in any detail the *consistent and repeated* allegations by Lee and her parents from their statements given to MBI agents shortly after the incident that Stickman knelt on Damien's neck and that Damien kept complaining that he could not breathe.  As discussed, it is a question of fact **for a jury to determine** whether the deceased was resisting arrest or "was merely trying to get into a position where he could breathe."  *Darden*, 880 F.3d at 730.

¶48.    There is likewise a dispute as to the cause of death in the record.  The State Medical Examiner's report states that the cause of death is undetermined, but the Plaintiffs' expert witness, Dr. Shandelle Norford, opined in her March 27, 2024 affidavit that "the manner of death is homicide."  Dr. Norford stated that "to a reasonable degree of medical probability, the cause of death [was] cardiopulmonary arrest as a result of neck and back/chest

23

compression, by both officers, during law enforcement subdual and restraint (leading to restraint associated asphyxia) with a contributing factor of methamphetamine use." More specifically, Dr. Norford opined that "*the restraint associated asphyxia*, possibly in combination with the sympathomimetic effects of methamphetamine led to an acute cardiac dysrhythmia and subsequent cardiac death." (Emphasis added).

¶49. Lastly, both deputies acknowledged in their separate incident reports that after Damien had been beaten, handcuffed, taken from the house, and placed into the patrol car, Elward employed a taser for a third time to "drive stun" Damien in his thigh because Damien allegedly was kicking at Elward with his legs and would not get his feet into the car. However, Cameron testified that the officers threw Damien face down into the back of the car, and there is no other testimony indicating that once Damien was handcuffed, he was resisting arrest. We therefore find that there is a genuine issue of a material fact whether this use of force (i.e., tasing Damien for a third time) also constituted excessive force—especially because he had been stating that he could not breathe.

¶50. Our supreme court "has held that the police may exert physical force in overcoming resistance during an arrest, but they may only use that force which is reasonably necessary to respond to the resistance encountered." *City of Jackson v. Powell*, 917 So. 2d 59, 71 (¶47) (Miss. 2005) (citing *Webb v. Jackson*, 583 So. 2d 946, 951 (Miss. 1991)). "[W]hen a subject has been subdued—meaning, he lacks any means of evading custody and does not pose a threat of immediate harm—the further use of force is not justified." *Timpa*, 20 F.4th at 1029 (citation omitted and internal quotation marks omitted). In this instance, the deputies "drive

24

stunned" an individual who (1) had already been tased two times, (2) was handcuffed and partially in the patrol car, (3) had been complaining that "he couldn't breathe," (4) was reportedly on drugs, and (5) was struggling to stand up without assistance. *Contra Ometu v. City of San Antonio*, No. SA-21-CV-925-OLG, 2023 WL 9502070, *8-9 (W.D. Tex. Nov. 15, 2023) (finding officers' "use of force was not objectively excessive considering that it was limited to pushing and pulling" the suspect into the patrol car "despite his resistance" to pull his legs into the car).

¶51. Although the Appellees and the dissent note that the Appellants have not argued "that any taser use, either pre-handcuffing or post handcuffing, or other use of force other than body weight violated clearly established law," we find that plain-error review is warranted,[15] as the evidence and testimony do not support the circuit court's finding that neither Elward nor Stickman "use[d] force after Damien was restrained and subdued."

¶52. As discussed, the deputies reported that Damien kept dropping to the ground while attempting to walk him to the patrol car, which they characterized as active resistance. But when viewed in context with the family's testimony that Damien was struggling to breathe and to walk and had been tased two times prior, we find it remains a question of fact whether tasing him *a third time* was objectively reasonable.

¶53. Accordingly, viewing the evidence in the light most favorable to the non-movant

---

[15] "Pursuant to Rule 28(a)(3) of the Mississippi Rules of Appellate Procedure, 'the Court may, at its option, notice a plain error not identified or distinctly specified.'" *In re Guardianship of Duckett*, 991 So. 2d 1165, 1183 (¶44) (Miss. 2008) (quoting M.R.A.P. 28(a)(3)). "Plain-error review is appropriate when (i) a party has failed to preserve an error for appellate review and (ii) a substantial right is affected." *Id.* (citing *State Hwy. Comm'n of Miss. v. Hyman*, 592 So. 2d 952, 957 (Miss. 1991)).

Plaintiffs, we conclude that there are disputed issues of material fact as to whether the officers employed excessive force, and we reverse the circuit court's order granting of summary judgment in favor of Elward and Stickman based on qualified immunity.[16]

## II. Whether the circuit court erred in finding Rankin County was entitled to immunity under the MTCA.

¶54. Finding the state law claim against Rankin County "is likewise appropriate for summary judgment," the circuit court held:

> Plaintiffs cannot proceed on their negligence claim for two reasons. First, for the same reasons that the Court found Elward and Stickman's use of force was not unreasonable, the Court finds the officers were not acting with reckless disregard for Damien's safety. And second, Damien was engaged in criminal activity at all times material to this case. He attempted to evade arrest on foot, failed to comply, and resisted arrest.

Appealing the circuit court's findings, the Appellants contend that the evidence did not demonstrate there was a "causal nexus between [Damien's] resistance and attempts to flee and the reckless actions of the deputies which resulted in [Damien's] death." *See, e.g.*, *Est. of Williams ex rel. Williams v. City of Jackson*, 844 So. 2d 1161, 1165 (¶15) (Miss. 2003) ("In order for recovery from a governmental entity to be barred because of the victim's

---

[16] We therefore disagree with the dissent's assertions that the evidence was "undisputed." As to the credibility of the evidence, we do not challenge the officers' credibility in our analysis; that is for the Appellants to argue on remand. It was the deputies' conclusion that Damien's falling to the ground was active resistance. However, the family, witnessing the same conduct, determined that Damien was "weak" and could not have walked without help. Elward's conclusions have been proven wrong on at least one other occasion; for example, after Damien asked for water, and his mother asked if she could give him some, Elward responded, "He don't want no water. He just don't want to get in the f**king truck." It is undisputed that within a few minutes, Damien was unresponsive with no pulse. Thus, we find that genuine issues of material fact prevent summary judgment in this case.

criminal activity, the criminal activity has to have some causal nexus to the wrongdoing of the tortfeasor."). Citing the same arguments from the prior issue, the Appellants also argue that "even if Damien Cameron resisted arrest, that is not incongruent with a finding that deputies Elward and Stickman were reckless in their methods of detention and arrest of [Damien]."

¶55. Under the MTCA, "[a] governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim" that

> arise[s] out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless **the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury** . . . .

Miss. Code Ann. § 11-46-9(1)(c) (emphasis added). Thus, "[t]his statutory provision affords a governmental entity 'two avenues of immunity: (1) **if the decedent was engaged in criminal activity, then the governmental entity is immune**, and (2) **if the decedent was not engaged in criminal activity, and if the governmental entity's employees did not act with reckless disregard, then the governmental entity is immune**." *Irwin-Giles v. Panola County*, 253 So. 3d 922, 925-26 (¶12) (Miss. Ct. App. 2018) (emphasis added) (quoting *Est. of Williams*, 844 So. 2d at 1164 (¶11)). "[T]he statute 'is not designed to protect grossly negligent or intentional tortfeasors from liability where the fact that the victim is engaged in a criminal activity is merely fortuitous and has no relation to the transaction out of which the liability would otherwise arise.'" *Id*. (quoting *City of Jackson v. Perry*, 764 So. 2d 373, 379 (¶25) (Miss. 2000)). "Questions concerning the application of the MTCA are reviewed de

novo." *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 994 (¶7) (Miss. 2003). "Immunity is a question of law." *Id*.

### A. Criminal Activity

¶56. The Appellants do not dispute that Damien had been engaged in criminal activity prior to his arrest; they merely assert that his "crime of resisting or evading arrest is 'merely fortuitous.'" However, our Court has recognized that if "an officer has probable cause to arrest and proceeds to do so, there is the requisite nexus between criminal activity and the action causing injury." *Tory v. City of Edwards*, 829 So. 2d 1246, 1249 (¶14) (Miss. Ct. App. 2002) (quoting *Bridges v. Pearl River Valley Water Supply Dist.*, 793 So. 2d 584, 588 (¶13) (Miss. 2001)).[17] "The criminal activity supporting the exemption must be more than fortuitous, but it applies to misdemeanors as well as felonies." *Durn*, 861 So. 2d at 997.

¶57. The circuit court found that, after vandalizing a neighbor's home, which Sheriff Bailey had characterized as "felony malicious mischief," Damien (1) fled from the authorities, (2) failed to comply with a deputy's repeated instructions and warnings, (3) and resisted arrest.[18] As Lee and her father acknowledged, Damien "tussled" with Elward and refused to be handcuffed. We find there is credible evidence showing that there was the requisite "causal nexus" between the force used and Damien's criminal activity prior to his

---

[17] In *Bridges*, the supreme court rejected the appellant's argument "that the Legislature did not intend to include all crimes, especially minor misdemeanors," holding that "[n]o authority or logic supports this contention." *Bridges*, 793 So. 2d at 588 (¶¶10-11).

[18] Mississippi Code Annotated section 97-9-73 provides, "It shall be unlawful for any person to obstruct or resist by force, or violence, or threats, or in any other manner, his lawful arrest or the lawful arrest of another person by any state, local or federal law enforcement officer[.]" Miss. Code Ann. § 97-9-73 (Rev. 2020).

restraint.

¶58. However, as discussed, we agree with the Appellants that "it would be a question of fact as to whether [Damien's] *continued* resistance was actually 'resistance' or movement to try to position himself to be able to breathe" and "is only one factor to be considered in determining the constitutionality of the actions of Elward and Stickman." (Emphasis added). Thus, there exists a disputed material fact as to when Damien's active resistance ceased.

### B. Reckless Disregard

¶59. The Appellants further argue, for the same reasons stated with regard to the claims of excessive force, that "deputies Elward and Stickman were in reckless disregard of the rights of Damien Cameron."

¶60. The Mississippi Supreme Court has "held that 'reckless disregard' under Section 11-46-9(1)(c) 'is a higher standard than gross negligence' and 'embraces willful or wanton conduct which requires knowingly or intentionally doing a thing or wrongful act.'" *Phillips v. City of Oxford*, 368 So. 3d 317, 324 (¶23) (Miss. 2023). "Reckless disregard is found where there is a deliberate disregard of an unreasonable risk and a high probability of harm." *City of Jackson v. Shavers*, 97 So. 3d 686, 688 (¶8) (Miss. 2012) (citing *City of Laurel v. Williams*, 21 So. 3d 1170, 1175 (Miss. 2009)). "Reckless disregard 'usually is accompanied by a conscious indifference to consequences, [amounting] almost to a willingness that harm should follow.'" *Id.* (citing *Maye v. Pearl River County*, 758 So. 2d 391, 394 (¶19) (Miss. 1999)); *see also Turner v. City of Ruleville*, 735 So. 2d 226, 230 (¶19) (Miss. 1999) ("Our case law indicates 'reckless disregard' embraces willful and wanton conduct which requires

knowingly and intentionally doing a thing or wrongful act.").

¶61. "The plaintiff has the burden of proving 'reckless disregard' by a preponderance of the evidence." *Hinds County v. Burton*, 187 So. 3d 1016, 1022 (¶17) (Miss. 2016) (quoting *Titus v. Williams*, 844 So. 2d 459, 468 (¶37) (Miss. 2003)). In order to avoid summary judgment, therefore, the Plaintiffs were required to show a material dispute as to whether the acts by the deputies (i.e., placing their knee on Damien's neck and back and employing the taser to drive stun Damien in the leg after his stating that he could not breathe) were with the knowledge and intent to cause Damien injury. Incorporating their claims from their excessive-force argument, the Plaintiffs assert:

> Given the injuries suffered by Cameron, and the physical evidence of his autopsy report establishing that significant pressure had in fact been applied to his neck and to his back, the opinion of the plaintiff[s'] expert regarding the cause of death of Damien Cameron, and the testimony of his mother and his grandparents that he cried out to Stickman and Elward that he could not breathe, and *that Cameron was left alone and face down in the deputies vehicles for several minutes while they went inside the house to retrieve a taser*, a jury question is created as to . . . whether they acted with reckless disregard for Cameron's rights under the Mississippi Tort Claims Act.

(Emphasis added).

¶62. The circuit court based its ruling that the officers' actions did not constitute reckless disregard on its findings of fact with regard to the excessive-force claim. As already discussed, however, we find there are genuine issues of material fact whether the deputies' use of force was "objectively reasonable" under the circumstances and whether Damien was actively resisting arrest after being handcuffed. Elward and Stickman reported that Damien repeatedly dropped to the ground (e.g., "the suspect continued to pull away and followed by

30

dropping to the ground"), but they characterized his actions as resisting arrest. Damien's family members averred that Damien was having trouble breathing and that the officers supported Damien's walking to the patrol car and threw him face down into the vehicle.

¶63. Furthermore, as already discussed in detail, there was conflicting evidence whether the officers knelt on Damien's back and neck in their attempt to handcuff him. According to Sheriff Bailey, the county's policies and procedures expressly prohibit the use of choke holds, which "include[s] applying pressure to a person's neck to stop the flow of blood to the brain." We recognize that "[v]iolation of a department policy is not necessarily outcome-determinative" in determining if an officer acted with reckless disregard. *Berry v. Jackson County*, 397 So. 3d 911, 930-31 (¶65) (Miss. Ct. App. 2024). In *Berry*, however, we found that even if the officers in that case had violated department policy, "it is unclear how these policy violations would create a genuine issue of material fact or that any of the alleged policy violations proximately caused the accident and Berry's injuries. Rather, the totality of the circumstances must be considered." *Id*. at 931 (¶65).

¶64. Conversely, in the present case, we find that it is evident how this violation of policy could create a genuine issue of material fact as to whether the use of a choke hold in this instance, considering the totality of the circumstances (e.g., Damien's clearly being under the influence of drugs, his stating he could not breathe, and subsequent expert testimony that "the cause of death is cardiopulmonary arrest as a result of neck and back/chest compression, by both officers"), constituted reckless disregard for Damien's safety.

¶65. Based on these disputed material facts, we determine that the circuit court erred in its

31

ruling, and we reverse the order granting summary judgment as to the MTCA state law claims with regard to the deputies' actions after restraining Damien with handcuffs. We emphasize that a finding of a genuine issue of material fact does not mean that the Defendants will be held liable—rather, it is a factual determination for the finder of fact (i.e., the jury for the §1983 claim; the trial judge for the MTCA claim).

### III. Whether the circuit court erred in denying the July 18, 2023 motion for leave to amend the complaint.

¶66. Lastly, the Appellants challenge the circuit court's decision to deny their July 2023 motion for leave to amend the complaint. The second amended complaint contained new additional claims against Rankin County, alleging that Rankin County was liable under § 1983 based on its policies, or lack thereof, regarding excessive force. The Plaintiffs also asserted a claim of supervisory liability and *Monell* violation, contending that the Rankin County Sheriff Bryan Bailey's lack of supervision and training "created an environment of indifference to the rights of citizens."

¶67. As discussed, the circuit court denied the Plaintiffs' second motion to amend the complaint "based on undue delay, failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment." The court's holding is in accordance with the supreme court's reasoning regarding Rule 15(a) of the Mississippi Rules of Civil Procedure, stating:

> In the absence of any apparent or declared reason—such as *undue delay*, bad faith or dilatory motive on the part of the movant, *repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment*, etc.—the leave sought should, as the rules require, be "freely

32

given."

*Moeller v. Am. Guar. & Liab. Ins. Co.*, 812 So. 2d 953, 962 (¶28) (Miss. 2002) (quoting *Estes v. Starnes*, 732 So. 2d 251, 252 (¶4) (Miss. 1999) (emphasis added));[19] *see also Gilmer v. McRae*, 355 So. 3d 219, 227 (¶25) (Miss. 2022) (holding that "a trial court may deny a motion to amend if the amendment would cause 'undue prejudice to the opposing party' or 'undue delay' in the litigation" (citing *Webb v. Braswell*, 930 So. 2d 387, 393 (¶9) (Miss. 2006))).

¶68.    This Court reviews a trial court's "denial of a motion to amend a complaint under an abuse of discretion standard." *Archer v. Harlow's Casino Resort & Spa*, 395 So. 3d 71, 74 (¶9) (Miss. Ct. App. 2024). "When the proposed amendment would still render the claim futile, the trial court is well within its discretion to deny such request." *Id*. (quoting *Spiers v. Oak Grove Credit LLC*, 328 So. 3d 645, 651 (¶14) (Miss. 2021)).

> ### A.    Undue Delay and Failure to Cure Deficiencies by Amendments Previously Allowed

¶69.    The Plaintiffs filed the initial complaint on March 25, 2022.  Once Rankin County filed its answer and Rule 12(c) motion on May 5, 2022, the circuit court entered its first scheduling order on May 11, 2022.  Discovery proceeded until the circuit court entered an agreed order staying the case, and it resumed upon entry of the agreed order lifting the stay

---

[19] We have emphasized only those factors the circuit court found relevant in its ruling to deny the motion.  Although the Appellees argue "bad faith and dilatory motive" in their brief, we will not address that issue, since the court made no findings in that regard.  We do, however, agree with the Appellees' contention that the second amended complaint contained assertions not supported by any testimony (e.g., that Damien "lost consciousness before Defendants removed his unresponsive body" from the home).

and the agreed amended scheduling order on October 18, 2022. The amended scheduling order mandated a discovery deadline of May 23, 2023, and a motion deadline of June 23, 2023. Following written discovery responses by Rankin County in October 2022, Plaintiffs moved for leave to file an amended complaint on November 14, 2022, which the court granted. The Plaintiffs filed their first amended complaint on December 16, 2022, which contained no new claims against the parties.

¶70. The Plaintiffs hired new counsel in March 2023; yet, they did not file the second motion for leave to amend until July 18, 2023, three weeks after the motion deadline in the scheduling order. Furthermore, although the court subsequently entered an amended scheduling order in August 2023, the Plaintiffs did not notice the motion for leave to amend for a hearing until November 2023. The court denied the motion a week later.

¶71. In *D.L. Markham DDS, MSD Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 613 (5th Cir. 2023), the United States Court of Appeals for the Fifth Circuit found no abuse of discretion in district court's denial of a plaintiff's leave to amend, with the district court noting that "Plaintiffs were aware of the potential deficiencies in their complaint for over a year yet mentioned 'new' allegations and 'new' claims only in response to the second motion, . . . provided no excuse for their delay in seeking leave to amend, and . . . granting leave would be an inefficient use of the court's resources."

¶72. Similarly, in the present case, we agree with the circuit court that although the Plaintiffs had an opportunity to cure any deficiencies (e.g., assert the *Monell* violation claim) and amend the complaint with full knowledge of Rankin County's discovery responses and

34

Rule 12(c) motion to dismiss, they failed to do so. We also find no abuse of discretion in the court's holding that granting leave would result in "undue delay" in the litigation. *See Thompson v. Tex. Dep't of Crim. Just.*, 67 F.4th 275, 283 (5th Cir. 2023) (finding no abuse in district court's denial of motion to amend because the "addition of new claims would cause undue delay").

### B.     Undue Prejudice

¶73.    The Plaintiffs did not set the motion for leave to amend for a hearing until after deadlines in the second amended scheduling order had expired or would soon be expiring. The Appellees assert that "[a]llowing Plaintiff[s] to amend the complaint another time at this late stage would cause extensive, undue delay to the proceedings" and "would have unnecessarily prolonged this case by essentially restarting the clock on answers, discovery, motions, etc., all unnecessarily at the expense of Defendants."

¶74.    Upon review, we agree with the court's determination that granting the motion would have resulted in undue prejudice to the Defendants. As the supreme court held in *Hinton v. Rolison*, 175 So. 3d 1281, 1287 (¶16) (Miss. 2015), "[a]n amendment may be prejudicial 'where it would burden the adverse party with more discovery, preparation, and expense.'" (Quoting *Webb*, 930 So. 2d at 394-95 (¶11)). Allowing the Plaintiffs to amend their complaint to include additional liability claims after twenty months of litigation would have required further discovery and expenses and resulted in undue prejudice to the Defendants.

¶75.    Accordingly, we find no abuse of discretion in the circuit court's decision to deny the Plaintiffs' July 2023 second motion for leave to amend the complaint.

## Conclusion

¶76. We reverse and remand the circuit court's order granting summary judgment in favor of Elward and Stickman, as we find there are genuine issues of material fact whether the deputies' actions were objectively reasonable and entitled them to qualified immunity. We also reverse and remand the circuit court's ruling to grant summary judgment in favor of Rankin County on the state law claim under the MTCA.

¶77. We affirm the court's decision to deny the Plaintiffs' second motion for leave to amend the complaint.

¶78. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY AND WEDDLE, JJ., CONCUR. LAWRENCE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. LASSITTER ST. PÉ, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY EMFINGER, J.; WILSON, P.J., JOINS IN PART.**

**LASSITTER ST. PÉ, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶79. The circuit court correctly granted summary judgment in favor of Rankin County and Deputies Elward and Stickman, and that judgment should be affirmed. The circuit court's denial of Lee's motion to amend should also be affirmed. Therefore, I respectfully dissent in part and concur in part.

¶80. At the outset, this case is governed by well-settled principles. Summary judgment is appropriate where the record reveals no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. M.R.C.P. 56(c). Likewise, under 42 U.S.C.

36

§ 1983, a plaintiff must establish both a constitutional violation and that the conduct at issue violated clearly established law. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5-6 (2021). Lee has done neither, and summary judgment should be affirmed.

## I.       No Constitutional Violation

¶81.    The record, viewed in the light most favorable to Lee, does not support a finding that Deputies Elward or Stickman used excessive force in violation of the Fourth Amendment. While the majority opinion focuses extensively on the deputies' actions *after* Damien was handcuffed, it is important not to lose sight of Lee's allegation in this case. Lee's complaint alleged that Elward "positioned himself with his body weight on [Damien's] back while trying to arrest him" and that "Stickman ran into the room and kneeled across the back of [Damien's] neck, impeding his ability to breathe." In response to the motion for summary judgment, Lee points only to her testimony that the deputies knelt on Damien's neck during their attempt to handcuff and subdue him. She also points to James Cameron's testimony that one deputy had his knee on Damien's neck while the other handcuffed him and testimony that Damien said he could not breathe. Lee's response also focuses on the alleged cause of death relating to the pressure applied by deputies during the handcuffing. So the majority's conclusion that the deputies' tasing Damien multiple times creates a material issue of fact simply does not matter here—that is not what the party alleged as the excessive force.[20]

---

[20] Indeed, the majority uses Damien's difficulty walking to the car *after* the handcuffing as evidence that the deputies should have known *during* the handcuffing that their use of force was excessive. The majority further uses plain-error review to essentially change the arguments presented by Lee by concluding that the deputies violated clearly established law through their use of the taser, even though that argument was not made by Lee nor included in the complaint.

¶82. Focusing on the behavior alleged by Lee, the undisputed facts show that Damien fled from law enforcement, ignored commands, resisted arrest, and continued to struggle with deputies once Elward had him on the ground and was attempting to handcuff him. There is no evidence in the record before us that Elward or Stickman ever denied putting their knees on Damien's back or neck during this struggle. No evidence offered by Lee suggests that the deputies kept applying body weight pressure to Damien after they were able to handcuff him. The deputies applied force only in response to that resistance and ceased using force once Damien was restrained. Specifically, the circuit court found:

> After responding to a vandalism call and having identified the suspect, it is undisputed that Elward instructed Damien to put his hands up, but Damien fled on foot attempting to enter the house.
>
> Elward tased Damien, but Damien removed the prongs. Damien then ran inside towards the back of the house when Elward, after another warning, tased him again. Once Elward caught up with Damien, it is undisputed that, while kneeling on Damien's back, Elward still struggled to get Damien handcuffed and subdued. It is undisputed that Elward was unable to get Damien handcuffed and subdued until Stickman arrived and assisted. Elward or Stickman did not continue force after Damien was restrained and subdued.

¶83. Accepting as true Lee's allegation that the deputies kneeled on Damien's back, the question becomes whether that use of force was reasonable. Under relevant precedent, courts must evaluate the reasonableness of force from the perspective of a reasonable officer on the scene, paying particular attention to the severity of the crime, the threat posed, and whether the suspect is actively resisting or attempting to flee. *See Lombardo v. City of St. Louis*, 594 U.S. 464, 467 (2021). Each of those factors weighs in favor of the deputies here. The circuit court found that Damien "fled from Elward, was non-compliant, was warned about being

38

tased and ignored the warning, remained unfazed after being tased, physically struggled with Elward until Stickman arrived on scene, and where Elward did not use force after Damien was restrained and subdued." Lee presented no credible evidence contradicting those findings.

¶84. Given the undisputed credible evidence, I am unable to say the deputies' use of force was excessive. I would find that the deputies' use of force was proportionate to the circumstances confronting them and was not a constitutional violation.

## II. No Violation of Clearly Established Law

¶85. Even assuming arguendo that a constitutional violation could be inferred, Lee's claims still fail because she has not shown that the deputies violated clearly established law.

¶86. Qualified immunity protects officers unless "the official's allegedly wrongful conduct violated clearly established law." *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 980 (¶19) (Miss. 2004). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas*, 595 U.S. at 5. Lee was required to identify a case with sufficiently analogous facts demonstrating that the force used in these circumstances was unlawful. I agree with the lower court and find that Lee has failed to meet this burden. Like the circuit court, I find *Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021), relied on by Lee, is inapplicable, as the record "shows active resistance during the use of force," and "*Timpa* by contrast is about continued force when resistance stopped and the individual is fully restrained." I agree with the circuit court's findings that "Stickman's application of force was the only way Damien was ultimately

39

restrained and subdued and [that] . . . Stickman did not use force after Damien was restrained and subdued."

¶87.    Looking solely at the deputies' use of force while handcuffing Damien, I believe that the facts here align more closely with precedent recognizing that "officers may consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate the suspect's compliance." *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018). The record reflects precisely that scenario. Witnesses agreed that Damien ran from the deputies, that Damien and Elward fought on the floor, and that Stickman had to assist Elward in handcuffing Damien on the ground. Even accepting as true Lee's testimony that deputies had their knees pressed into Damien's back, evidence suggests that this was not for a prolonged period of time. Looking solely at the evidence surrounding the use of body-weight force—the only thing asserted by Lee—I conclude that Lee did not establish that the deputies violated clearly established law. Accordingly, Deputies Elward and Stickman are entitled to qualified immunity.

### III.    No Reckless Disregard

¶88.    The circuit court also correctly granted summary judgment on Lee's state-law negligence claim. The Mississippi Tort Claims Act provides immunity for claims arising out of police-protection activities unless the officer acted in reckless disregard of the safety of a person not engaged in criminal activity. Miss. Code Ann. § 11-46-9(c) (Rev. 2019). Neither requirement is satisfied here. First, the record contains no evidence that the deputies acted with reckless disregard, which requires willful or wanton conduct—far more than mere

40

negligence. *City of Vicksburg v. Williams*, 294 So. 3d 599, 601-02 (¶15) (Miss. 2020). Second, the undisputed facts show that Damien was actively engaged in criminal activity, including fleeing and resisting arrest, at all relevant times. Under these circumstances, Rankin County retains its statutory immunity.

**Conclusion**

¶89. The circuit court applied the governing legal standards to a record that presents no genuine dispute of material fact. By reversing that decision, the majority substitutes speculation for evidence and weakens the protections afforded by both qualified immunity and the summary judgment framework.

¶90. Because Lee has failed to demonstrate a constitutional violation, failed to identify clearly established law, and failed to overcome the County's statutory immunity, I would affirm the circuit court's grant of summary judgment. I would also affirm the trial court's decision to deny Lee's second motion for leave to amend the complaint.

¶91. Accordingly, I respectfully concur in part and dissent in part.

**EMFINGER, J., JOINS THIS OPINION. WILSON, P.J., JOINS THIS OPINION IN PART.**